**GULF OIL CORPORATION, a
Pennsylvania Corporation,
Appellant,**

v.

**Lydia CHIODO, Appellee.**

No. 85–2150.

United States Court of Appeals,
Fourth Circuit.

Argued July 15, 1986.

Decided Nov. 3, 1986.

William E. Galeota (Herbert G. Underwood, Steptoe & Johnson, Clarksburg, W.Va., on brief), for appellant.

David J. Straface (S.J. Angotti, Angotti & Straface, Morgantown, W. Va., on brief), for appellee.

Before MURNAGHAN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

This is an action in the diversity jurisdiction for the specific performance of a purchase option contained in the lease of an automobile service station. Upon consideration of cross motions for summary judgment, the district court granted the defendant's motion, holding that the fixed price purchase option was extinguished by the lessee's failure to exercise another option of first refusal after the lessor informed it of the receipt from a third party of an offer to purchase for an amount much higher than the fixed price option figure.

We conclude the judgment should have gone the other way.

I.

In October 1965, Mrs. Chiodo and her late husband entered into a lease agreement with American Oil Company upon a printed form prepared by American Oil. The lease was for a term of five years with three five-year renewal options at increasing rental rates. Each of the three renewal options was exercised, and the ultimate expiration date became October 31, 1985.

In June 1982, Gulf Oil acquired American Oil's operations in West Virginia, and succeeded to its rights as lessee of the Chiodo property.

The lease contained a "dual-option" provision, the full text of which, in relevant part, is printed in the margin.* It gave the

---

* Lessee shall have ... the option of purchasing [the] ... premises for the sum of [$40,000], provided Lessee shall give Lessor notice in writing of its election to exercise said option ... any time during the original term or any extension or renewal thereof. If any part of the demised premises ... shall be taken by the right of eminent domain ... the purchase price set forth herein, if the purchase option is exercised, shall be reduced in the same proportion....

lessee the option to purchase the property for $40,000. That option was exercisable at any time during the original term of the lease or any extension of it. There followed a second, first refusal option. It provided that if the lessors received from a third person an offer to purchase their property and the lessors wished to accept it, they must give notice to the lessee that would then have ninety days to acquire the fee by matching the third person's offer. There then followed a provision that if the lessee did not exercise its first refusal option, "this agreement and all its terms and conditions shall nevertheless remain in full force and effect and Lessor and any purchaser or purchasers of the demised premises ... shall be bound thereby...."

In November 1984, the defendant notified Gulf that she had received, and intended to accept, an offer to purchase the property for $121,000. Gulf responded with a notice purporting to exercise its fixed price purchase option and was prepared to pay Mrs. Chiodo $40,000. Upon her behalf, her attorney took the position that the fixed price option had been rendered "null and void" by her earlier notice that she had received and intended to accept an offer to buy the property for $121,000.

## II.

There is no case in West Virginia construing a comparable "dual-option" provision. The courts of that state do apply the usual, general rules of construction. The overriding objective of the court, of course, is to ascertain the intent of the parties. *See Bowlby-Harman Lumber Co. v. Com-* *modore Services, Inc.,* 144 W.Va. 239, 107 S.E.2d 602, 607 (1959). If the language of the contract is unambiguous, it must be enforced according to its terms. *See Orteza v. Monongalia County General Hospital,* 318 S.E.2d 40, 43 (W.Va.1984). When the bargain made by the parties is clearly apparent, each is entitled to have it performed without alteration. *See Wheeling Mold & Foundry Co. v. Wheeling Steel & Iron Co.,* 62 W.Va. 288, 57 S.E. 826, 832 (1907).

The district court reasoned that the parties had intended to create alternative options "of equal stature, each viable until one of them became vested." Applying this reasoning, the court held that when Gulf received Mrs. Chiodo's notice in November 1984 that she had received and intended to accept a third person's offer, Gulf's first refusal purchase option became vested, and its vesting extinguished the fixed price purchase option. We cannot agree that the conclusion flows from the premise. Gulf's fixed price purchase option was "vested" from the moment the lease was signed in 1965, but the defendant does not suggest that because the fixed price purchase option was unconditionally exercisable at any time it divested the first refusal purchase option. Notions of vesting have no place in the resolution of this controversy, but if one should pursue that distraction, one would think that preference should be given to the fixed price purchase option which was "vested" from the very beginning.

The language of American Oil's lease form is not the most felicitous, but it un-

It is further agreed that should Lessor, or Lessor's heirs, executors, grantees, successors or assigns, at any time during the term of this lease or any extension thereof, receive an offer to purchase the demised premises ... and desires to accept said offer, or should Lessor during any such time make an offer to sell the demised premises ... Lessor shall give Lessee [90] days' notice in writing of such offer, setting forth ... all ... terms and conditions of such offer, and Lessee shall have the first option to purchase the premises which are the subject of the offer by giving written notice to Lessor of its intention to purchase within said (90) day period, at the same price and on the same terms of any such offer, it being understood that in the event Lessee does not give notice of its intention to exercise said option to purchase within said period, this agreement and all of its terms and conditions shall nevertheless remain in full force and effect and Lessor and any purchaser or purchasers of the demised premises ... shall be bound thereby, and in the event that the premises set forth in the offer are not sold for any reason, Lessee shall have, upon the same conditions and notice, the continuing first option to purchase the demised premises ... upon the terms of any subsequent offer or offers to purchase.

mistakably expresses an intention that the fixed price purchase option should remain viable until final expiration of the lease. That option was made exercisable at "any time during the original term or any extension or renewal thereof." There is no language in the lease which in any way limits the right to exercise the fixed price option. Moreover, the preparer of the lease went to considerable pains to provide explicitly that if the lessee should decline to exercise its first refusal option the "agreement and all its terms and conditions shall nevertheless remain in full force and effect." That language cannot be squared with the notion that the defendant's notice to Gulf in November 1984 extinguished one of the principal terms of the lease.

No unfairness appears in the enforcement of the lease as written. The case was decided upon cross motions for summary judgment, so the record of surrounding circumstances is sparse, but it is common knowledge that fixed price purchase options in leases are usually at prices substantially higher than the lessor's notion of the present value of his land. We do know that the lessees in this case did erect substantial improvements upon the land, and a lessee would hardly be expected to erect substantial improvements upon leased land increasing the market value of the entire property above the fixed option price if that option could be extinguished by notice, late in the term, of the lessor's receipt of an offer from a third person at a much higher figure.

In the early days of a long term commercial lease, there is a real possibility that the lessor may wish to sell the property for a price substantially less than the fixed price option. At that time, the flow of rental income, as stipulated in the lease, may be a substantial limitation upon what would otherwise be the market value of the improved real estate unencumbered by a long term lease. There is no reason that the parties to a lease should not be allowed to deal with that situation by giving the lessee a right of first refusal if the lessor wishes to sell for an amount less than the fixed price option. There is no inconsistency between the two options, and the fixed price option remains exercisable notwithstanding that the circumstances contemplated by the first refusal option may arise.

The purpose of the inclusion of purchase options in a lease is entirely for the benefit of the lessee. That purpose might enlighten the construction of even an ambiguous document. *Crowley v. Texaco, Inc.*, 306 N.W.2d 871, 874 (S.D.1981); *Texaco, Inc. v. Creel*, 310 N.C. 695, 314 S.E.2d 506, 510 (1984).

### III.

There are a number of cases construing dual option provisions somewhat resembling this one, but any division in their legal constructions is generally "more apparent than real." *Green v. Sprague Ranches*, 170 Cal.App.2d 687, 339 P.2d 607, 610 (1959). The result seems to turn upon "the particular language used in the leases and the circumstances in which enforcement is sought." *See Conroy v. Amoco Oil Co.*, 374 So.2d 561, 564 n. 2 (Fla.Dist. Ct.App.1979).

There are three cases construing leases with identical provisions to this one.

In *Amoco Oil Co. v. Snyder*, 505 Pa. 214, 478 A.2d 795 (1984), and *American Oil Co. v. Ross*, 390 So.2d 90 (Fla.Dist.Ct. App.1980), the courts construed the dual option provision as we do. In *Amoco Oil Co. v. Kraft*, 89 Mich.App. 270, 280 N.W.2d, 505, 507 (1979), the court's conclusion is seemingly different. We disagree with its analysis, but there were present in *Kraft* extraordinary equitable considerations militating against enforcement of the fixed price option. In *Kraft*, the third person had actually purchased the property for a price considerably greater than the fixed purchase option price, and the lessee waited a number of years before attempting to exercise its option. In this case, no innocent third party stands to suffer a loss, and Gulf Oil was prompt in its attempt to exercise its fixed price option.

## IV.

The court may feel some sympathy for Mrs. Chiodo who now is to receive less for her property than its present market value appears to be. To some extent at least, that may be a consequence of improvements erected by the lessees. To what extent that is so, one cannot say on this record, but there is no suggestion of overreaching by American Oil in the negotiation of the lease in 1965. Mrs. Chiodo and her husband made their bargain and now must abide by it.

REVERSED.

WILKINSON, Circuit Judge, dissenting:

Unlike the majority, I cannot conclude that the language of this lease compels Chiodo to sell her property at the below market price of $40,000. The lease here is ambiguous; even courts cannot agree on the meaning of these lease provisions. Moreover, if the original parties actually intended to prevent Chiodo from selling her property for its fair market value, there are surely clear ways to say so. The majority's transmutation of vague terms into clear ones creates a bargain that the parties did not make. That fact is all the more disturbing when one considers that the parties were not equally sophisticated, but were an oil company armed with a phalanx of attorneys and a small property owner with little or no representation. Contrary to the majority's position, which interprets a standard lease in the light most favorable to the drafter, I would not allow the company to claim that its ambiguous language deprives a property owner of her right to sell her property for a fair market price.

## I.

Under the guise of "plain language", the majority rewards obscure draftsmanship. The fact that courts, all adopting a "plain meaning" analysis, have arrived at mutually exclusive interpretations of identical lease provisions should convince any skeptic of the lease's ambiguity. *Amoco Oil Co. v. Kraft*, 89 Mich.App. 270, 280 N.W.2d 505 (1979) (plain meaning of lease allows lessor to sell property at fair market value); *Amoco Oil Co. v. Snyder*, 505 Pa. 214, 478 A.2d 795 (1984) and *American Oil Co. v. Ross*, 390 So.2d 90 (Fla.App.1980) (plain meaning does not allow lessor to sell property for more than the fixed option price). The Pennsylvania court, on which the majority relies, was itself divided on the meaning of these "plain" provisions. *See Snyder*, 478 A.2d at 799 (Zappaca, J., dissenting). In this case, the district court interpreted the lease in accordance with the Michigan holding and the Pennsylvania dissent. I fail to understand how the majority can conclude that the lease has a plain meaning when other courts have adopted radically different interpretations of identical language.

The lease's ambiguity is illustrated by the ease with which the company could have drafted a clear provision. American Oil could have avoided any ambiguity simply by stating that "if the lessee does not exercise its right of first refusal, it retains the right to buy the property at the fixed-option price for the remainder of the lease." That idea is not so difficult as to elude embodiment in the wording of a lease. Other oil companies have encountered no problem in drafting similar provisions that explicitly preserve the lessee's fixed-price option. For example:

> Any option herein granted shall be continuing and pre-emptive ... and the failure of lessee to exercise same in any one case shall not affect lessee's right to exercise such option in other cases thereafter arising.

*Texaco v. Creel*, 310 N.C. 695, 314 S.E.2d 506 (1984).

> Shell's failure to exercise (its right of first refusal) shall in no way affect this lease, Shell's rights under Article Thirteen (fixed-price purchase option), or its right to the estate herein created.

*Shell Oil Co. v. Prescott*, 398 F.2d 592 (6th Cir.1968) (parentheses added). When the courts have confronted lease provisions that lack this clarity, they have correctly penalized the lessee-drafter by preventing it from exercising the fixed-price option

after a third party offer. *Shell Oil v. Blumberg*, 154 F.2d 251 (5th Cir.1946); *M & M Oil Co. v. Finch*, 7 Kan.App.2d 208, 640 P.2d 317 (1982); *Bobali Corp. v. Tamapa Co.*, 235 Pa.Super. 1, 340 A.2d 485 (1975).

Finally, this agreement is internally ambiguous whenever, as is likely in a long-term lease, the market value of the property appreciates beyond $40,000. When a third party makes an offer, the right of first refusal provision allows Chiodo to sell the property unless Gulf matches the offer's terms and conditions, but the fixed-price provision allows Gulf to buy the property for $40,000. The lease provides no guidance on which of these mutually exclusive provisions takes precedence in this situation. The majority exercises keen eyesight, but I fail to see the lease's "plain meaning" in light of the different judicial interpretations, the straightforward provisions in other oil company leases, and the contradictary signals in this particular case.

## II.

The majority's holding deprives Chiodo of the right to sell her property for a price even close to its fair market value. Gulf claims that Chiodo bargained this right away because the lease provides that, if the lessee does not exercise its right of first refusal, "all the lease's terms and conditions remain in full force and effect." In its haste to avoid paying Chiodo what her property is worth, Gulf strains this innocuous provision beyond the breaking point.

Gulf's interpretation essentially nullifies the first refusal clause because few will offer to buy the property for more than $40,000 if Gulf retains its fixed-price option. More importantly, under this interpretation, Gulf may buy the property for the lesser of $40,000 or fair market value; at most, Gulf pays the fair market price

and probably pays much less. By contrast, the most that Chiodo can receive for her property is $40,000, and she runs the risk of losing money if her property appreciates beyond that figure. Thus, Gulf would turn this nebulous clause into the legal equivalent of "heads I win, tails you lose." *

It may be, of course, that the purchase options are included "entirely for the benefit" of Gulf Oil. (*See ante* at p. 286). Moreover, parties do sign contracts with substantial risks and unfavorable terms. But before we impute any such intent to Chiodo, we ought at least to insist that the onerous term be clear. As contractual language becomes more general, it usually becomes less clear. The language to which Gulf points incorporates the lease terms through the most sweeping of references, when a single specific reference would have clarified the crucial point beyond cavil. Nowhere in the lease did the drafter explain the connection between the fixed price and first refusal option, and the majority's description of the draftsmanship as "not the most felicitous" is charitable indeed.

The most reasonable interpretation of this vague language is that Gulf could buy the property for $40,000, but once a third party appears, Gulf could buy the property only on the terms and conditions of the third party offer. The "terms and conditions" clause simply means that the lessee could continue to lease the same property on the same terms after Chiodo sold the property. Indeed, the disputed provision explicitly refers to the fact that subsequent purchasers are bound by its terms. This interpretation is more realistic because it reflects a reasonable property owner's belief that, absent a clear waiver of the right, she can sell her property for its fair market value.

---

* Gulf also claims that, if the court requires it to pay the fair market value, Gulf would be paying for its own improvements. Gulf, however, could have easily avoided this problem by an earlier exercise of its fixed-price option or by a clearly drafted contract. Gulf's other claim, that the total rental payments plus the $40,000 purchase price is a good deal for Chiodo, is simply irrelevant because the issue is not the wisdom of the bargain, but the language of the lease.

The majority's interpretation operates as a significant restraint on the alienation of real property. Such restraints are disfavored. *Williams v. First Fed. Sav. & Loan Assoc.*, 651 F.2d 910, 919 (4th Cir. 1981). Nonetheless, if the original parties had specifically restricted Chiodo's right to sell her property, their intent should be upheld. Such a clearly written contract is certainly not unconscionable. Nor should this court let Chiodo out of a bad bargain. What it has done, however, is force her into a bargain she never made.

### III.

Rather than allowing Gulf to rely on the "plain meaning" of this lease, I would conclude that the lease is anything but plain and should be construed against the drafter. *Nisbet v. Watson*, 162 W.Va. 522, 251 S.E.2d 774, 780 (1979); *Sun Lumber Co. v. Thompson Land & Coal Co.*, 138 W.Va. 68, 76 S.E.2d 105, 109 (1953). The flaw of the lease is that it fails to put Chiodo on notice that she was surrendering the right to sell her property for what it was worth. By upholding Gulf's interpretation, the majority allows an oil company, through inscrutable boilerplate, to buy a lessor's property for below market value without ever negotiating for that right. I would require the companies to draft their standard leases in language that affords to parties like Chiodo fair notice of their obligations and fair opportunity to bargain for their rights.

I would affirm the judgment of the district court.