911 F.2d 721
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BURNING CREEK MARROWBONE LAND COMPANY, a West Virginia
Corporation, Plaintiff-Appellant,
v.
EAST KENTUCKY ENERGY CORPORATION, a Kentucky corporation,
Wolf Creek Collieries Company, a Kentucky
corporation, Defendants-Appellees.
 No. 90-3018.
 United States Court of Appeals, Fourth Circuit.
 Argued July 18, 1990.
Decided Aug. 22, 1990.
Rehearing and Rehearing In Banc Denied Sept. 20, 1990.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Charles H. Haden II, Chief District Judge. (CA-89-261-3)
 James R. Bailes, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.Va., (argued), for appellant; Nicholas Reynolds, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, West Virginia, on brief.
 Richard J. Bolen, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, W. Va., for appellees.
 S.D.W.Va.
 REVERSED AND REMANDED.
 Before WIDENER and HALL, Circuit Judges, and BLATT, Senior United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Burning Creek Marrowbone Land Company ("Burning Creek") appeals the order of the district court entering summary judgment in favor of East Kentucky Energy Corporation ("East Kentucky") and Wolf Creek Collieries Company ("Wolf Creek") on Burning Creek's breach of contract and fraud claims. Finding that the lower court erred in its interpretation of the parties' contract, we reverse and remand for further proceedings.
 
 I.
 
 2
 After extensive negotiations, on November 28, 1967, Burning Creek leased to Wolf Creek approximately 2500 acres of the Warfield Coal Seam in Mingo County, West Virginia. The lease provided for a royalty of $.15 per ton of coal mined, or 3% of the gross sales price, whichever was greater, and a wheelage rate of $.02 per ton. The lease allowed Wolf Creek to use contract miners on the property, but strictly prohibited any transfer of the lease or sublease without Burning Creek's prior written consent. Any attempt by Wolf Creek to make such a transfer immediately cancelled its interest in the property.
 
 
 3
 At the time the lease was executed, Wolf Creek was a successful and well-funded non-union operator in Kentucky. This venture was an attempt to establish a non-union mine in the predominantly unionized coal fields of southern West Virginia. To facilitate this goal, and simultaneously reduce the risk that any unionization of the West Virginia operation would spread to Kentucky, Wolf Creek's corporate counsel, Zane Grey Staker, created Kermit Coal Company, a shell corporation, to run the Mingo County mine.[1] To further this subterfuge, all of Kermit's stock was nominally held by third parties. However, at all times Kermit was in reality a wholly-owned subsidiary of Wolf Creek Coal Corporation, which was also the sole owner of Wolf Creek. In August 1969, the Mingo County mine opened with Kermit as operator.
 
 
 4
 In February 1970, A.T. Massey Coal Company, Inc. ("A.T. Massey"), acquired all of the stock of Wolf Creek Coal Corp. Sometime around the time of this acquisition, Burning Creek, through its president, Lant Slaven, inquired about Kermit's status at the mine and the possibility that there had been an unauthorized sublease. By a single letter, dated February 27, 1970, representatives of A.T. Massey, Wolf Creek Coal Corp., Wolf Creek, and Kermit jointly stated that "[n]o transfer to Kermit, or other action prohibited by paragraph 14 of our lease [the anti-assignment provision] ... is or will be involved." Burning Creek was also told that it could consider any acts of Kermit as acts of Wolf Creek. Kermit then continued to operate the mine without complaint from Burning Creek.
 
 
 5
 In 1974, Wolf Creek approached Burning Creek to lease additional reserves. After negotiations, Burning Creek agreed to lease to Wolf Creek all other seams on the original 2500 acres as well as all coal on an additional 2300 acres. In return, Wolf Creek agreed to increase the royalty on the Warfield seam to $.75 per ton, or 5% of the gross selling price, and to pay the same royalty for the new reserves.
 
 
 6
 Kermit continued to operate the mine, apparently without objection from Burning Creek, until February 1979, when Wolf Creek again approached Burning Creek to amend the lease. Wolf Creek sought to assign the lease to appellee East Kentucky, another A.T. Massey subsidiary. It also sought the right to sublease portions of the mine in the future to other A.T. Massey subsidiaries without Burning Creek's consent. Burning Creek eventually agreed to these amendments, but only after Wolf Creek agreed to remain liable for all lease obligations and to increase Burning Creek's lost coal royalty.[2]
 
 
 7
 On October 24, 1979, Wolf Creek assigned the lease to East Kentucky, which, shortly thereafter, sublet portions of the property to Kermit and to Marrowbone Development Company ("Marrowbone").
 
 
 8
 In 1987, East Kentucky, Wolf Creek, Kermit, and Marrowbone all became wholly-owned subsidiaries of Scallop Coal Corporation ("Scallop"), a company which is not an A.T. Massey subsidiary. On December 2, 1988, East Kentucky notified Burning Creek of a proposed merger of Marrowbone into Scallop, and of East Kentucky's position that under the 1979 amendment to the lease, Burning Creek's consent was not needed for the transfer of the sublease incident to the merger. Burning Creek disagreed with this conclusion and, on February 16, 1989, it brought this action against both Wolf Creek and East Kentucky in state court.
 
 
 9
 The focus of the suit, however, was not the proposed Scallop-Marrowbone merger. Rather, it was Burning Creek's allegation of an unauthorized assignment of the lease by Wolf Creek to Kermit in 1969. Burning Creek based its allegation on a notation of the assignment found in a lease digest. Prior to filing suit, Burning Creek had requested documents from Wolf Creek and East Kentucky to verify the assignment. These requests were denied. In the state court action, Burning Creek sought only a declaration that it could immediately cancel the lease because of the unauthorized assignment.
 
 
 10
 Defendants removed the case to district court and filed an answer and counterclaim. They denied any breach of the anti-assignment provision of the lease and asserted, inter alia, that even if such a breach had occurred, it had been waived by Burning Creek's conduct because Burning Creek, through Lant Slaven, knew of the assignment all along. In their counterclaim, they sought a declaration that Burning Creek's consent was not needed for the assignment incident to the proposed Scallop-Marrowbone merger or, in the alternative, if such consent was necessary, it could not be unreasonably withheld.
 
 
 11
 During discovery, Burning Creek found two documents purporting to transfer the lease from Wolf Creek to Kermit. The first was an assignment dated June 3, 1969. The second was a letter agreement dated July 2, 1973. Neither document had ever been recorded. Officers of the defendants and of A.T. Massey testified in depositions that the assignments were never intended to actually transfer the lease, but were merely documents generated for tax purposes to allow Kermit to claim a depletable economic interest in the leasehold. They also testified that the June 3, 1969, assignment was executed sometime after July 1970, but had been backdated to roughly coincide with Kermit's commencement of operations at the mine.
 
 
 12
 Upon discovery of the assignment documents, Burning Creek amended its complaint, added claims for fraud and breach of contract, and sought nearly $31,000,000 in contractual, compensatory, and punitive damages. The fraud claim was based on the February 27, 1970, letter from the defendants which unequivocally stated that no unauthorized assignment of the lease had or would occur and the defendants' subsequent failure to disclose the assignment. Although it had received all contractual royalties to date, Burning Creek's theory of recovery was that if it had known of the violation of the anti-assignment provision when it renegotiated the lease in 1974 and 1979, it could have used the threat of lease cancellation to negotiate higher, market rate royalties for its coal. It claimed that it agreed to below market rate royalties in 1974 because of the need to increase the very low royalty on the 2500 acres of the Warfield seam it had contracted for in 1967. Burning Creek supported its claim by expert opinion that the market rate for coal in 1974 was higher than 5% of sales price and that if Wolf Creek would have been forced off the property, Burning Creek could have easily located a new lessee.
 
 
 13
 Defendants moved to dismiss the amended complaint and for summary judgment on their counterclaim. The district court considered the motion to dismiss as one for summary judgment and granted it. For purposes of the motion, the court assumed that Wolf Creek assigned the lease to Kermit and that it did so without Burning Creek's knowledge. Nevertheless, the court found that under the circumstances of this case, such a transfer did not violate the anti-assignment provision because the assignment deprived Burning Creek of none "of the benefits which prohibitory clauses are intended to secure, (i.e., management ability, expertise and financial responsibility)."[3] Thus, the district court held that although the assignment arguably violated the letter of the provision, it did not violate its spirit. Further, because the transfer did not breach the lease, the defendants' failure to disclose the transfer could not give rise to a cause of action for fraud. The lower court also commented that Burning Creek's damage claims were further flawed because they were excessive and too speculative to support recovery. On the defendants' counterclaim, the court held that the assignment of the lease incident to the proposed Scallop-Marrowbone merger was covered by the anti-assignment provision, and Burning Creek's consent was thus necessary. The court agreed with defendants, however, that Burning Creek could not unreasonably withhold its consent. This appeal followed.
 
 II.
 
 14
 Burning Creek challenges both the district court's interpretation of the anti-assignment provision of the lease and the court's holding that its damage claims were excessive and too speculative to support recovery. We examine the contract issue first.[4]
 
 
 15
 Burning Creek argues that the district court's interpretation of the anti-assignment provision to allow for the Wolf Creek-Kermit transfer was contrary to the plain language of the contract as well as the intent of the parties. For the same reasons, Burning Creek argues that the lower court erred in holding that it cannot arbitrarily withhold its consent to the assignment incident to the Scallop-Marrowbone merger. Burning Creek's position is that the anti-assignment provision erected a complete ban of unauthorized assignments and created an absolute right in it to withhold consent to any such transfers. We are persuaded that Burning Creek is right on the first point.
 
 
 16
 In Gulf Oil Corp. v. Chiodo, 804 F.2d 284, 285 (4th Cir.1986), we summarized the West Virginia law which controls our interpretation of this contract:
 
 
 17
 The overriding objective of the court, of course, is to ascertain the intent of the parties. See Bowlby-Harman Lumber Co. v. Commodore Services, Inc., 144 W.Va. 239, 107 S.E.2d 602, 607 (1959). If the language of the contract is unambiguous, it must be enforced according to its terms. See Orteza v. Monongalia County General Hospital, 318 S.E.2d 40, 43 (W.Va.1984). When the bargain made by the parties is clearly apparent, each is entitled to have it performed without alteration. See Wheeling Mold & Foundry Co. v. Wheeling Steel & Iron Co., 62 W.Va. 288, 57 S.E. 826, 832 (1907).
 
 
 18
 Thus, the focus of our inquiry must be the language of the anti-assignment provision itself. If it is clear in its prohibition of assignments by Wolf Creek, it must be given effect.
 
 
 19
 In paragraph 14 of the 1967 lease, Wolf Creek as lessee agreed that it
 
 
 20
 shall not transfer, mortgage, encumber, assign, convey, lease, underlet or sublease (except for the use of its employees) any of the estate, interest or rights of Lessee hereunder, to any person, firm or corporation in any manner whatsoever without the consent of Owner [Burning Creek] in writing for that purpose being first had and obtained, and no such result shall be brought about by operation of law except at the option of Owner evidenced by writing signed by Owner; any violation, or attempted violation, of the provisions of this paragraph shall, at Owner's option, effect an immediate cancellation of this lease; and no consent by Owner to any such specific action, whether voluntary or by operation of law, shall be construed as a matter of law or otherwise, as a consent to any such subsequent action.
 
 
 21
 This provision could not be more comprehensive in its prohibition of unauthorized assignments and Wolf Creek's transfer of the lease to Kermit could not more plainly constitute its breach. Appellee's argument on behalf of the district court's contrary conclusion is unpersuasive.
 
 
 22
 In support of the district court's holding, appellees rely heavily on Goldman v. Daniel Feder & Co., 84 W.Va. 600, 100 S.E. 400 (1919). In Goldman, the West Virginia court reiterated its adherence to the venerable rule that anti-assignment provisions, like other restraints on alienation, must be strictly construed. To breach such a provision, the court held that a party's actions must violate both its letter and its "spirit or purpose." Id. 100 S.E. at 401. Appellees contend that this transfer could not have violated the spirit of p 14 because, as sister wholly-owned subsidiaries of A.T. Massey, Kermit and Wolf Creek had the same mining expertise and financial resources. Holding that the assignment thus posed no risk of economic harm to Burning Creek, the district court agreed with this reasoning. See also, e.g., Mitsui & Co., Inc. v. Puerto Rico Water Resources Authority, 528 F.Supp. 768, 791 (D.P.R.1981); People v. McNamara Corp., Ltd., 28 Cal.App.3d 641, 104 Cal.Rptr. 822 (1972). We do not.
 
 
 23
 The "spirit or purpose" of a contract is, of course, nothing more than the parties' intent. As the West Virginia court has repeatedly made clear, that intent is best evidenced by the terms of the parties' contract. And, where those terms are clear, "they must be applied and not construed." Orteza, 318 S.E.2d at 43. Here, the purpose of this provision is plain. It is intended to prohibit any assignment of Wolf Creek's interest in the lease without Burning Creek's prior consent. When presented with the plain language of this provision, there is no need for us to grope for its purpose to determine if Wolf Creek's actions constituted a breach. Whatever the practical reasons behind this provision, its plain language must be enforced. This is especially true here, where the parties are sophisticated business entities which carefully, and at arm's length, negotiated the terms of this lease. We hold that Wolf Creek's assignment of the lease to Kermit, absent Burning Creek's consent, violated p 14.
 
 
 24
 In short, we reverse the grant of summary judgment on Burning Creek's breach of contract claim. Because Wolf Creek's actions may have constituted a breach of the lease, its failure to disclose that breach in the face of Burning Creek's specific inquiry may have constituted fraud. Therefore, we reverse the grant of summary judgment on the fraud claim as well.[5]
 
 
 25
 Turning to appellees' counterclaim, any ruling on the necessity or conditions of Burning Creek's consent to the proposed Scallop-Marrowbone merger would be premature. On remand, if appellees are unsuccessful in proving any of their defenses, then the lease, including the 1979 amendments through which Marrowbone acquired its interest in the mine, will be subject to cancellation. Further, if Burning Creek can show fraud in the negotiation of the 1979 amendments, those amendments may have been void ab initio. Only if appellees successfully defend below will the issue raised in the counterclaim be appropriate for adjudication. Consequently, we vacate the district court's judgment on the counterclaim and remand for further proceedings.
 
 III.
 
 26
 Burning Creek also complains that the district court erred in holding that its claim for damages was excessive and too speculative to support recovery. We do not, however, read the district court's statements on this point as alternative grounds for entry of summary judgment on the damage claims. Rather we view them as entirely dependent upon the court's ruling that p 14 had not been breached. Now that this underlying ruling has been reversed, Burning Creek's damage claims stand in a completely different light. Consequently, we leave the issue of Burning Creek's damages for further factual development on remand.
 
 IV.
 
 27
 In sum, we find that the district court erred in its interpretation of the anti-assignment provision of the parties' contract. Consequently, we reverse the summary judgments based on this erroneous interpretation and remand for further proceedings.
 
 
 28
 REVERSED AND REMANDED.
 
 
 
 [1]
 At that time, Staker was also counsel to Burning Creek and was the law partner of Burning Creek's president, Lant Slaven. It is clear that Slaven knew of Kermit's formation and the reasons therefor. Slaven's further knowledge of Kermit's status at the mine is a factual matter sharply disputed by the parties. It is also a difficult point of proof because both Slaven and Staker are dead
 
 
 [2]
 The "lost coal royalty" is the royalty paid to Burning Creek for mineable coal left unmined, or for mineable coal rendered unrecoverable, by the operator
 
 
 [3]
 Under West Virginia law, the assignment of a lease by a lessee does not relieve that lessee of his obligations under the lease. Kanawha-Gauley Coal & Coke Co. v. Sharp, 73 W.Va. 427, 80 S.E. 781, 783 (1914)
 
 
 [4]
 Burning Creek also challenges the district court's holding that certain documents were properly withheld by appellees under the attorney-client privilege. Our review of the record shows that the lower court did not err on this point
 
 
 [5]
 In doing so, we express no opinion as to appellee's proferred defenses on either claim, which may be asserted on remand, including the assertion that Burning Creek's president, Lant Slaven, was aware of the assignment. We do, however, reject appellees' contention that this breach was cured by Kermit and Wolf Creek's 1989 agreement, made after the commencement of this litigation, to reconvey the lease to Wolf Creek effective as of 1979. This anemic attempt to rectify a breach which occurred almost 20 years before carries no weight