693 S.E.2d 53

**Bernard BOGGS, Plaintiff,**

v.

**CAMDEN–CLARK MEMORIAL HOSPITAL CORPORATION, Defendant,**

v.

**Bernard Boggs, Plaintiff,**

v.

**Richard A. Hayhurst and Cincinnati Insurance Company, Defendants.**

No. 35223.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 2010.

Decided April 1, 2010.

Ancil G. Ramey, Steptoe & Johnson, Charleston, WV, for Defendant, Richard A. Hayhurst.

Christopher J. Regan, Bordas & Bordas, Wheeling, WV, for Plaintiff, Bernard Boggs.

Adam Barnes, Walsh, Collin & Blackmer, Pittsburgh, PA, for Defendant, Cincinnati Insurance Co.

Dino S. Colombo, Richard W. Stuhr, Colombo & Stuhr, Morgantown, WV, for Defendant, Camden–Clark Memorial Hospital.

Davis, Chief Justice:

This matter comes before this Court upon a request from the Circuit Court of Wood County to answer four certified questions. The parties to this proceeding are: Richard A. Hayhurst (hereinafter "Mr. Hayhurst"), defendant; Cincinnati Insurance Company (hereinafter "CIC"), defendant; and Bernard Boggs (hereinafter "Mr. Boggs"), plaintiff. By order dated March 20, 2009, the circuit court certified the following four questions to this Court:

1. Do allegations of a malicious prosecution suit against the insured, an attorney, by a client's former opponent in a previous action defended by the insured fall within the scope of a commercial general liability policy of [sic] personal umbrella liability policy issued to the attorney wherein the term "personal injury" is defined to include "malicious prosecution"?

Answer: Yes X No _____

2. Under a liability insurance policy wherein the term "personal injury" is defined to include "malicious prosecution," is a malicious prosecution suit against the insured, an attorney, by a client's former opponent in a previous action defended by the insured excluded by policy language that states that "This insurance does not apply to ... 'personal injury' ... due to rendering ... professional services unless professional liability coverage has been endorsed hereon or stated in the Declarations. This includes but is not limited to: (1) Legal, accounting or advertising services"?

Answer: Yes X No _____

3. Under a personal umbrella liability insurance policy wherein the term "personal injury" is defined to include "malicious prosecution," is a malicious prosecution suit against the insured, an attorney, by a client's former opponent in a previous action defended by the insured excluded by policy language that states that "This insurance does not apply to ... 'personal injury' arising out of any act, malpractice, error or omission committed by any 'insured' in the conduct of any profession or

'business,' even if covered by 'underlying insurance' "?

Answer: Yes X No \_\_\_\_

4. Do the "professional services" exclusion of the business owners package policy and/or the "professional liability" exclusion of the personal umbrella liability policy apply when the claim asserted against the policyholder for which coverage is sought is not made by a person or entity to whom the policyholder rendered professional services, but by a third-party to whom no professional services were rendered?

Answer: Yes X No \_\_\_\_

Upon review of the parties' briefs, arguments, and the record, we answer the certified questions, as reformulated, and remand this matter for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

This case relates to a medical malpractice/wrongful death lawsuit filed by Mr. Boggs against Camden–Clark Memorial Hospital and others in 2003.[1] During that proceeding, Camden–Clark was represented by Mr. Hayhurst. While the case was pending, Camden–Clark filed two unsuccessful counterclaims against Mr. Boggs. As a result of the unsuccessful counterclaims, Mr. Boggs, in 2005, filed a second lawsuit against Camden–Clark, alleging a claim for malicious prosecution as a result of the two unsuccessful counterclaims.[2]

In 2006, Mr. Boggs filed a separate lawsuit against Mr. Hayhurst. That lawsuit also alleged claims for malicious prosecution due to the filing of the two unsuccessful counterclaims. On August 8, 2006, Mr. Hayhurst sent a letter to his legal malpractice insurer, Liberty Insurance Underwriters, informing the insurer of the suit against him. In that letter, Mr. Hayhurst stated:

This claim arises from my services as trial counsel for Camden–Clark Memorial Hospital Corporation in two separate actions for wrongful death arising from alleged medical malpractice.... During the course of those two cases, the Hospital filed counterclaims against the plaintiff due to lack of foundation for proceeding against the Hospital. When applicable law changed, the counterclaims were dismissed.... Notwithstanding the ... dismissal of the counterclaims, the plaintiff ... sued the Hospital in 2005 for abuse of civil process and malicious prosecution. That action pends.

The enclosed civil action is identical in form and substance to the 2005 action brought by Mr. Boggs against the Hospital and makes the same charges against me by virtue of my actions as trial counsel for the Hospital....

... Please docket this claim and call me right away to discuss the identity of counsel to be assigned to me.

By letter dated September 6, 2006, Liberty Insurance notified Mr. Hayhurst that it would provide defense counsel for him, but that it was reserving its right to deny coverage based upon any applicable exclusion under its policy. Thereafter, on February 9, 2007, Mr. Hayhurst sent a letter to CIC requesting coverage under two policies it issued to him: a commercial general liability policy and a personal umbrella liability policy. CIC denied coverage under the two policies.

Eventually, the malicious prosecution actions against Camden–Clark and Mr. Hayhurst were consolidated. It appears that, after the consolidation, Mr. Boggs amended his complaint in 2008 to add CIC as a defendant. The claim against CIC was for declaratory judgment on the issue of whether the two insurance policies it issued to Mr. Hayhurst covered the malicious prosecution claims asserted against Mr. Hayhurst.[3] Af-

---

**1.** See Boggs v. Camden–Clark Mem'l Hosp. Corp., 216 W.Va. 656, 609 S.E.2d 917 (2004) (addressing pretrial procedural issues in the case).

**2.** The medical malpractice/wrongful death lawsuit was resolved by a jury verdict in favor of Mr. Boggs in March 2006.

**3.** See Syl. pt. 3, Christian v. Sizemore, 181 W.Va. 628, 383 S.E.2d 810 (1989) ("An injured plaintiff

ter CIC was brought into the case, Mr. Hayhurst filed a cross-claim against CIC that involved the issue of insurance coverage.[4]

■ Subsequent to the filing of the amended complaint, Mr. Boggs, Mr. Hayhurst and CIC moved for summary judgment on the insurance coverage issue. By order entered March 20, 2009, the circuit court denied the summary judgment motions by Mr. Boggs and Mr. Hayhurst. In that same order, the circuit court found the two insurance policies at issue did not provide coverage for the claims asserted against Mr. Hayhurst. Therefore, the circuit court granted summary judgment in favor of CIC. On the same day, the circuit court also entered an order certifying the aforementioned four questions to this Court.[5]

## II.

## STANDARD OF REVIEW

Here, we are asked to respond to certified questions from the circuit court. We have held that "[t]he appellate standard of review of questions of law answered and certified by a circuit court is de novo." Syl. pt. 1, Gallapoo v. Wal–Mart Stores, Inc., 197 W.Va. 172, 475 S.E.2d 172 (1996). We would also note that, to the extent we are required to examine the language of insurance policies to an-

swer the certified questions, we have held that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that . . . shall be reviewed de novo on appeal." Syl. pt. 2, in part, Riffe v. Home Finders Assocs., Inc., 205 W.Va. 216, 517 S.E.2d 313 (1999).

## III.

## DISCUSSION

This case presents four certified questions from the Circuit Court of Wood County for our consideration and determination. However, based upon this Court's inherent authority,[6] we have determined that the most efficient way to resolve these questions is to reformulate and consolidate them into a single question as follows:

Does the commercial general liability policy or the personal umbrella liability policy issued by CIC to Mr. Hayhurst cover the claims for malicious prosecution asserted by Mr. Boggs against Mr. Hayhurst?

■ When deciding cases concerning the language employed in an insurance policy, we look to the precise words employed in the policy of coverage. As a general rule, we accord the language of an insurance policy its

---

may bring a declaratory judgment action against the defendant's insurance carrier to determine if there is policy coverage before obtaining a judgment against the defendant in the personal injury action where the defendant's insurer has denied coverage.").

4. Additionally, CIC filed a declaratory judgment action against Mr. Hayhurst in federal court. The record does not indicate the disposition of the federal case.

5. The procedural manner in which this case was brought to this Court is somewhat confusing. Insofar as the circuit court granted summary judgment in favor of CIC, and dismissed the amended complaint against it with prejudice, the court should have made the summary judgment order a final appealable order under Rule 54(b) of the West Virginia Rules of Civil Procedure. "Under 54(b) an order granting a motion to dismiss as to some, but not all parties, is a final appealable judgment if the order expressly states that it is a final order and contains an express determination that there is no just reason for delay in final adjudication of the rights and lia-

bilities in question." Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 54(b), at 1072 (3d ed.2008). Because Rule 54(b) was the most appropriate rule for bringing this case to this Court as an appeal of a summary judgment order, the circuit court should not have relied upon the certification statute to have this Court perform an indirect review of its summary judgment dismissal order.

6. We previously have held that this Court has the authority to reformulate questions certified to it for resolution:

When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in W. Va.Code, 51–1A–1, et seq. and W. Va.Code, 58–5–2 [1967], the statute relating to certified questions from a circuit court of this State to this Court.

Syl. pt. 3, Kincaid v. Mangum, 189 W.Va. 404, 432 S.E.2d 74 (1993).

common and customary meaning. That is, "[l]anguage in an insurance policy should be given its plain, ordinary meaning." *Horace Mann Ins. Co. v. Adkins*, 215 W.Va. 297, 301, 599 S.E.2d 720, 724 (2004) (internal quotations and citation omitted). We accept the plain meaning of the policy provisions under review, without interpretation or construction, except where ambiguity warrants such further consideration of the policy language. " 'Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended.' Syllabus, *Keffer v. Prudential Ins. Co.*, 153 W.Va. 813, 172 S.E.2d 714 (1970)." Syl. pt. 2, *West Virginia Fire & Cas. Co. v. Stanley*, 216 W.Va. 40, 602 S.E.2d 483 (2004). On the other hand, "[w]henever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syl. pt. 1, *Prete v. Merchants Prop. Ins. Co. of Indiana*, 159 W.Va. 508, 223 S.E.2d 441 (1976). Further, "[w]here a provision of an insurance policy is ambiguous, it is construed against the drafter, especially when dealing with exceptions and words of limitation." *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995) (citing Syl. pt. 1, *West Virginia Ins. Co. v. Lambert*, 193 W.Va. 681, 458 S.E.2d 774 (1995)).

In addressing the reformulated question, we will separately review the language of the commercial general liability policy and the personal umbrella liability policy.

7. While we refer to the policy as a commercial general liability policy, the policy is actually styled as a Businessowners Package Policy.

8. Mr. Hayhurst had two commercial general liability policies that may have overlapped the claims made by Mr. Boggs. One policy covered the period May 20, 2002, to May 20, 2005. The other policy covered the period May 20, 2005, to May 20, 2006. Although the record contains the Declaration page for both policies, the record has only one copy of an actual policy. Insofar as none of the parties have argued that the language from the policy provided in the record differs from the omitted policy, we assume that the

### A. *Commercial General Liability Policy*

▮ The first issue we address is whether the commercial general liability policy provides coverage for the malicious prosecution claims asserted against Mr. Hayhurst.[7] The relevant provisions of the policy are as follows:[8]

**POLICY COVERAGES**[9]

In return for the payment of the premium, and subject to all other terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Section I—Property**

*Business Personal Property*

Limit of Insurance: $ *40,000*

☐ Actual Cash Value ☒ Replacement Cost

. . . .

**OPTIONAL COVERAGES**—Coverage is afforded only where an entry ☒ is made in the boxes below:

☐ Equipment Breakdown ☐ Tenant's Glass
☐ Employment Practices Liability
☐ Professional Liability ☐ Earthquake Coverage
☐ Umbrella Liability

. . . .

**A. Coverages**

1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "personal injury" . . . to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "personal injury" to which this insurance does not apply. . . .

. . . .

b. This insurance applies:

relevant language for both policies was essentially the same. Also, Mr. Hayhurst attached to his reply brief, and relies upon, a copy of a policy that actually covered the period May 20, 2006, to May 20, 2007. Because the relevant terms of the policy attached to Mr. Hayhurst's reply brief and the policy relied upon by the circuit court are exactly the same, though organized differently, it is of no moment as to which policy is relied upon.

9. We are relying upon what appears to be the policy that covered the period May 20, 2002, to May 20, 2005.

. . . .

(2) To: "personal . . . injury" only if:

(a) "The personal . . . injury" is caused by an offense arising out of your business. . . .

. . . .

**B. Exclusions**

**1. Applicable to Business Liability Coverage**

This insurance does not apply to:

. . . .

**j. Professional Services**

"[P]ersonal injury" . . . caused by the rendering or failure to render professional services unless professional liability coverage has been endorsed hereon or stated in the Declarations. This includes but is not limited to:

(1) Legal, accounting or advertising services[.]

. . . .

**F. Liability and Medical Expenses Definitions**

. . . .

13. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention, or imprisonment;

b. Malicious prosecution[.]

(Footnote added).

Essentially three arguments are raised by Mr Hayhurst and Mr. Boggs as to why the above policy language provides coverage: (1) ambiguity in the meaning of professional services, (2) reasonable expectation of coverage, and (3) the exclusion is limited to a claim against Mr. Hayhurst by one of his clients. We will examine each argument individually.

**(1) The term "professional services" in the commercial general liability policy.** Mr. Hayhurst and Mr. Boggs contend that the "professional services" exclusion is ambiguous because that term is undefined. To support this argument, Mr. Hayhurst's brief relies upon the decision in *Johnson ex rel.*

**10.** The underlying case was a wrongful death action against the insured. The insured and plaintiff entered into a settlement agreement in

*Estate of Johnson v. Acceptance Insurance Co.*, 292 F.Supp.2d 857 (N.D.W.Va.2003).

█ In *Johnson,* the plaintiff (estate of decedent) filed a first-party bad faith action, as an assignee, against an insurer for refusing to defend and provide coverage for its insured (assignor) in the underlying action filed against the insured by the plaintiff.[10] The parties filed various pretrial motions. One of the pretrial motions required the court to determine whether the term "professional services" found in the applicable policy was ambiguous in the context of the facts of the case. The court addressed the issue as follows:

[T]his Court finds that the services rendered to Mr. Johnson at, and just prior to, the time of his injuries were not professional services to which the policy exclusion would then apply. This Court finds that the services rendered to plaintiff's decedent while he was under BHA's care were merely supervisory and custodial in nature. . . . Here, there is no clear indication in the record to suggest that the plaintiff's decedent had previously received services rendered by a medical or psychological professional during the time he was living at the Kountry Kove apartments or on the day he was injured. However, even if there is such evidence, there is no indication in the record that the rendering or failure to render a professional service was causally connected to the accident.

Moreover, the term "professional services" is not defined within the policy. Case law supports the proposition that the term "professional services" denotes those services rendered by someone with particularized knowledge or skill in his or her chosen field. . . . In light of this definition of "professional services," the Court finds that plaintiff's decedent's injuries were not the cause of the failure to render any type of professional service as that term is commonly understood and legally defined.

In any event, since the policy does not provide an explicit definition of "professional services," this Court finds that the

which the insured assigned its cause of action against the insurer.

term "professional services" in this policy is ambiguous. Ambiguities in insurance policies are construed against the insurer.... Therefore, since that term is ambiguous, it must be construed against Acceptance.

*Johnson*, 292 F.Supp.2d at 866 (internal citations omitted).

The determination in *Johnson* that the term "professional services" was ambiguous is not dispositive under the facts of the instant case. Moreover, the opinion in *Johnson* is flawed. It found that the conduct in the case did not involve rendering professional services as that term is commonly understood. Yet, the opinion went on to unnecessarily find the term ambiguous in the policy. Mr. Hayhurst's reliance on *Johnson* is misguided.

A case squarely on point with the facts of the instant case is *Harad v. Aetna Casualty and Surety Co.*, 839 F.2d 979 (3rd Cir.1988). In that case, a Pennsylvania attorney, Charles Harad, was sued by a plaintiff for malicious prosecution, which action arose out of a prior case in which Mr. Harad had represented a defendant insurer being sued by the plaintiff. The malicious prosecution claim was due to Mr. Harad "signing a verification to an answer and counterclaim, in which [the insurer] asserted that [plaintiff] 'conspired and/or contrived to defraud [insurer] by concealing and/or misrepresenting the fact that the vehicles' insured by [insurer] were for personal rather than business use." *Harad*, 839 F.2d at 980–81. Mr. Harad had two policies from different insurers. One policy was a commercial general liability policy, which was issued by Aetna Casualty and Surety Company; and the other policy was a professional liability insurance policy, which was issued by Home Insurance Company. The commercial general liability policy excluded coverage for professional services as follows:

**H. PROFESSIONAL LIABILITY EXCLUSION:**

This insurance does not apply:

1. When this policy is issued to a Medical Doctor, Dentist, Osteopath, Veterinarian, Nurse, Psychologist, Chiropractor, Funeral Director, X–Ray Technician, Appraiser, Optometrist, Optician, Attorney or accountant or ... arising out of the rendering or failure to render any professional service....

*Harad*, 839 F.2d at 983. When Aetna Casualty declined to provide a defense or coverage, Mr. Harad and Home Insurance filed a declaratory judgment action against Aetna Casualty, seeking a determination that coverage was included under the commercial general liability policy. After a default judgment was rendered against Aetna Casualty, it moved to set aside the default. The federal district court denied the motion to set aside the default on the following grounds:

The district court expressed its view that a malicious prosecution claim was not excluded under the policy because [Mr.] Harad had not rendered or failed to render professional services to the party suing him. The court also found the exclusion ambiguous in light of the overall policy provisions establishing coverage, and construed the ambiguity against the drafter.[11]

*Harad*, 839 F.2d at 981 (footnote added). The Third Circuit Court of Appeals reversed based upon the following reasoning:

Our interpretation of the applicability of the exclusion is consistent with the policy when examined as a whole, which we must also consider. Aetna's policy was entitled "Business Owners Policy (Deluxe)," which implies that the policy was intended to cover liability arising from the operation of a business. The terms of the policy purport to cover such business liability, but not professional liability. [Mr.] Harad and Home argue that [Mr.] Harad's business is the practice of law. However, the practice of law, as other similarly regulated professional activity in today's world, has two very different and often overlooked components—the professional and the commer-

---

**11.** Mr. Hayhurst's brief argued that "the policyholder in *Harad* did not assert that [the professional services] language was ambiguous, [therefore,] the [appellate] court applied a different standard which does not apply in the instant case." This assertion is not supported by the plain language of the *Harad* opinion.

cial. The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a[sic] certain minimum professional and ethical standards. The commercial aspect involves the setting up and running of a business, i.e., securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other. Indeed, the professional services and the business distinction drawn by the two policies and [Mr.] Harad's recognition of the limitations inherent in each is manifested by the fact that [Mr.] Harad purchased a separate professional liability policy from Home.

Given the dual nature of the practice of law, an attorney's liability for an action should be assessed depending on the particular role he was performing at the time the alleged liability arose. For example, if an attorney, while hosting a real estate closing in his office, places his briefcase on the floor and a colleague trips on it, is injured and sues him, the lawyer's liability would derive not from the rendering of a professional service, but rather from his operation of a business. Conversely, since [Mr.] Harad's conduct in this case was not related to his operation of a business, but was derived solely from his providing legal services to a client, his liability is professional in nature.

We are of the opinion that [Mr.] Harad's conduct in this case falls squarely within the meaning of the phrase "rendering ... [a] professional service" as set forth in the professional liability exclusion of the policy, and that the exclusion applies and provides a complete defense to plaintiffs' action. We therefore will reverse the default judgment and remand. The district court will enter judgment in favor of Aetna. Each party to bear its own costs.

*Harad*, 839 F.2d at 985 (internal citation omitted).[12] *See also American Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) ("The professional services exclusion in the Policy is not ambiguous. The terms in the Policy have plain meaning, and judicial construction is unnecessary."); *Western World Ins. Co. v. American & Foreign Ins. Co.*, 180 F.Supp.2d 224, 231 (D.Me.2002) ("I conclude that the term 'professional services,' as used in the Royal policy, is not ambiguous. As other courts have noted, the line between what constitutes a professional service and what does not is capable of being drawn with some precision."); *National Ben Franklin Ins. Co. of Illinois v. Calumet Testing Servs., Inc.*, 60 F.Supp.2d 837, 845–46 (N.D.Ind. 1998) ("[W]hen the insured is being sued for taking actions in the course of providing professional services, and where those actions both are reasonably related to the services being provided and involve the use of (or failure to use) professional knowledge, skill, experience, or training, the 'professional services' exclusion applies." (internal quotations and citation omitted)).[13]

The determination by the appellate court in *Harad* that the term "professional services" was not ambiguous is in line with this

---

**12.** Mr. Hayhurst has erroneously asserted that Pennsylvania state courts have rejected the analysis in *Harad*. Mr. Hayhurst supported this assertion by citing to the decision in *Biborosch v. Transamerica Insurance Co.*, 412 Pa.Super. 505, 603 A.2d 1050, 1055 (1992). *Biborosch* did not reject *Harad*. The decision in *Biborosch* stated that *Harad* was factually distinguishable and therefore not applicable. *See Biborosch*, 603 A.2d at 1055 ("While we might agree with the statements of the *Harad* court in a case that presented the same issue as was presented there, we nevertheless do not agree that the *Harad* court's observations are apposite to this case. *Harad* did not involve the policy at issue here, which contains its own expansive definition of 'professional services,' specifically including all acts 'necessary or incidental' to the conduct of the insured's insurance business and administration in connection therewith.").

**13.** Mr. Hayhurst seeks to have this Court reject the analysis by the majority opinion in *Harad* and adopt the position of the dissenting opinion. We decline to do so. The dissent in *Harad* ignored the fact that the attorney in *Harad* chose to limit the type of coverage he obtained from Aetna Casualty to that of essentially business premises liability. Instead, he chose to obtain professional liability coverage from a different insurer—Home Insurance. In the final analysis, the search for the deepest pocket should never entail wrongfully rewriting the insurance policy terms that the parties agreed upon.

Court's decision in *State Automobile Mutual Insurance Co. v. Alpha Engineering Services, Inc.*, 208 W.Va. 713, 542 S.E.2d 876 (2000) (hereinafter *"State Auto "*). In *State Auto*, an insurer filed a declaratory judgment action to determine whether the professional services exclusion in a policy it issued to its insured (a coal company) barred coverage in an underlying suit against its insured. The circuit court found that the exclusion applied, and the insured appealed. The professional services exclusion at issue in *State Auto* provided as follows:

> This insurance does not apply to: ...
>
> ....
>
> j. "Bodily injury", "property damage", "personal injury" or "advertising injury" due to rendering or failure to render any professional service. This includes but is not limited to: ...
>
> ....
>
> (2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
>
> (3) Supervisory, inspection or engineering services....

*State Auto.*, 208 W.Va. at 715–16, 542 S.E.2d at 878–79. This Court determined, in *State Auto*, that the above exclusion was not ambiguous and applied to the case as follows:

> The exclusion at issue in this case plainly excludes any coverage for "[p]reparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications" and "[s]upervisory, inspection or engineering services." The complaint filed by Brock Mining alleges that [the insured] was obligated to provide these professional services, and that its agent, Alpha, was negligent in providing these professional services. In sum, [the insured] provided the contracted-for professional services to Brock Mining through the use of an agent. The language of the exclusion appears to be unambiguous, and in accordance with our prior holdings, must be applied and not construed.
>
> We therefore find that the circuit court did not err in declaring that the profes-sional services exclusion applied to the actions alleged in Brock Mining's complaint. The circuit court correctly applied the exclusion to the actions alleged in Brock Mining's complaint, and properly concluded that State Auto had no duty to defend or provide coverage under its liability policy for [the insured's] negligent provision of surveys, maps and engineering services to Brock Mining.

*State Auto.*, 208 W.Va. at 717, 542 S.E.2d at 880. *See also* Syl. pt. 4, *Webster County Solid Waste Auth. v. Brackenrich & Assocs., Inc.*, 217 W.Va. 304, 617 S.E.2d 851 (2005) ("The inclusion in a standard commercial general liability policy of language that excludes coverage for 'professional liability' is specifically designed to shift the risk of liability for claims arising in connection with the performance of professional services away from the insurance carrier and onto the professional.").

In view of the foregoing authorities, we now hold that the term "professional services" contained in a commercial general liability policy, when not otherwise specifically defined, denotes those services rendered by someone with particularized knowledge or skill in his or her chosen field. *See Atlantic Lloyd's Ins. Co. of Texas v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 476–77 (Tex.App. 1998) ("To qualify as a professional service, the task must arise out of acts particular to the individual's specialized vocation. We do not deem an act a professional service merely because it is performed by a professional. Rather, it must be necessary for the professional to use his specialized knowledge or training.").

In the instant proceeding, contrary to the position taken by Mr. Hayhurst and Mr. Boggs, the term "professional services" used in the policy is not ambiguous. Under the policy in this case, there is no coverage for professional services that "include[ ] but [are] not limited to: (1) Legal, accounting or advertising services." In other words, the policy in this case has expressly defined professional services to include the rendering of

legal services.[14] All of the malicious prosecution allegations against Mr. Hayhurst, as set out in Mr. Boggs' amended complaint, involve the filing of two counterclaims by Mr. Hayhurst in the underlying case. Mr. Hayhurst filed those counterclaims in his capacity as the attorney for Camden–Clark, and, as such, he was rendering professional services.[15] In fact, in Mr. Hayhurst's letter to his legal malpractice insurer, Liberty Insurance, he clearly stated that the malicious prosecution action "arises from my services as trial counsel for Camden–Clark[.]" Accordingly, the unambiguous policy language excludes coverage for the professional services rendered herein.

**(2) Reasonable expectation of coverage under the commercial general liability policy.** Mr. Hayhurst and Mr. Boggs also argued that Mr. Hayhurst had a "reasonable expectation" of coverage for a malicious prosecution claim because the policy defined a personal injury as including a claim for malicious prosecution. Regarding the doctrine of reasonable expectations, this Court has held:

> With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

Syl. pt. 8, *National Mut. Ins. Co. v. McMahon & Sons, Inc.* 177 W.Va. 734, 356 S.E.2d 488 (1987), *abrogated on other grounds by Potesta v. United States Fid. & Guar. Co.,* 202 W.Va. 308, 504 S.E.2d 135 (1998).

Mr. Hayhurst and Mr. Boggs cannot rely on the doctrine of reasonable expectations. This Court has made clear that, as a general rule, "[i]n West Virginia, the doctrine of reasonable expectations is limited to those instances … in which the policy language is ambiguous." *National Mut.,* 177 W.Va. at 742, 356 S.E.2d at 496.[16] The fact that the policy defined personal injury as including a claim for malicious prosecution did not make the policy ambiguous.[17] It is clear, from the recitation of the pertinent language of the policy quoted in this opinion, that the policy was designed to allow an insured, like Mr. Hayhurst, to pay an additional premium to obtain coverage for professional liability. As a consequence of this option, the policy included a provision that would provide coverage for a malicious prosecution claim for an insured who purchased professional liability coverage. The Declarations page of the policy clearly shows that Mr. Hayhurst *did not* purchase coverage for professional liability from CIC. Moreover, Mr. Hayhurst has not paid a premium for professional liability coverage under the policy.[18] *See American Int'l Bank v. Fidelity &*

---

14. Mr. Hayhurst has cited to the case of *S.T. Hudson Engineers, Inc. v. Pennsylvania National Mutual Casualty Co.,* 388 N.J.Super. 592, 909 A.2d 1156 (2006) as purportedly standing for the proposition that "[m]erely because a cause of action arises from a policyholder's business activities does not necessarily trigger the application of a professional services exclusion." This proposition may very well be valid under a factual setting different from the instant case.

15. Mr. Hayhurst has cited to the case of *Finnie v. LeBlanc,* 856 So.2d 208 (La.Ct.App.2003), for the proposition that, under various circumstances, malicious prosecution claims are not subject to professional services exclusions. This proposition may very well be true, as it was in *Finnie,* where the court determined that a counselor's conduct in falsely accusing the plaintiff in another suit did not arise out of his professional role. However, this proposition is inapplicable because the claims against Mr. Hayhurst arose exclusively out of his legal representation of Camden–Clark. *See also Atlantic Lloyd's Ins. Co. of Texas v. Susman Godfrey, L.L.P.,* 982 S.W.2d 472 (Tex.App.1998) (holding that attorney's letter

to solicit client was not legal service within meaning of policy's professional service exclusion).

16. *But see Luikart v. Valley Brook Concrete & Supply, Inc.,* 216 W.Va. 748, 613 S.E.2d 896 (2005) (per curiam) (recognizing applicability of doctrine of reasonable expectations to clear and unambiguous policy language in extremely limited circumstances).

17. *See American & Foreign Ins. Co. v. Colonial Mortgage Co., Inc.,* 936 F.2d 1162, 1169 (11th Cir.1991) (Hatchett, J., concurring) ("The essential purpose of an exclusion is to limit the scope of coverage granted in the coverage section of the policy. By definition, any exclusion is in direct conflict with the coverage section of the policy, but this conflict does not make the policy ambiguous.").

18. It is disingenuous for Mr. Hayhurst to assert that he reasonably believed that he had professional liability coverage under the CIC policy

*Deposit Co.*, 49 Cal.App.4th 1558, 1574, 57 Cal.Rptr.2d 567 (1996) ("Had these insureds desired to obtain a professional liability policy to protect them from charges resulting from the performance of professional services, such insurance could have been obtained. The premium would likely have been higher than the ... premium charged here for general business liability insurance." (internal quotations and citation omitted)). Under these facts, the doctrine of reasonable expectations is simply not applicable.

**■ (3) The professional liability exclusion in the commercial general liability policy.** Mr. Hayhurst and Mr. Boggs contend that the policy's professional services exclusion applies only to a claim asserted against Mr. Hayhurst by one of his clients.[19] At least two courts have squarely addressed this argument and have rejected the same.

The argument raised by Mr Hayhurst and Mr. Boggs was rejected by the court in *Harad, supra,* as follows:

> In this case, Harad was sued specifically because he had signed a verified complaint on behalf of his client.... The district court felt that this action on the part of Harad should not be considered a "rendering or failure to render [a] professional service." Determinative for the court below was the fact that "Mr. Harad neither rendered nor failed to render any profes-

sional service to the [party] who is now suing him." Thus, the district court was unwilling to accept that "professional liability" can ever arise out of an attorney's activities with anyone other than his own client.

. . . .

In examining the character of the conduct alleged to be actionable in this case, it appears to us that the nature of the services rendered by Harad was purely professional. Harad drafted, signed and filed on behalf of [his client] an answer and counterclaim, which conduct in turn exposed him to liability.... Clearly, these acts are professional in nature and go to the heart of the type of services an attorney provides to his clients. Indeed, Harad would not have been legally able to sign the answer and counterclaim (and thereby expose himself to liability) had he not been a licensed attorney acting on behalf of his client. Since Harad's liability in this case flowed directly from his performance of a professional activity, and as the policy excluded coverage for any liability arising from the "rendering ... of any professional service," the exclusion clearly obviates any duty to defend and indemnify.

*Harad,* 839 F.2d at 983–85.

The issue of a claim for malicious prosecution by a nonclient against an attorney was also addressed in *Vogelsang v. Allstate In-*

---

when he specifically purchased such coverage from Liberty Insurance.

**19.** In conjunction with this argument, Mr. Hayhurst has cited the case of *Utica National Insurance Co. of Texas v. American Indemnity Co.*, 141 S.W.3d 198 (Tex.2004), as standing for the proposition that a professional services exclusion does not apply when an insured does not breach any standard of professional care. Mr. Hayhurst has contended that the exclusion in this case should not apply because he did not breach any professional standard of care to Mr. Boggs. Further, Mr. Hayhurst asserts that our holdings in Syllabus points 2 and 3 of *Clark v. Druckman,* 218 W.Va. 427, 624 S.E.2d 864 (2005), do not allow an action against an attorney by a nonclient for breach of a professional standard of care. This Court held the following in Syllabus points 2 and 3 of *Clark:*

> 2. An attorney for a party in a civil lawsuit does not owe a duty of care to that party's adversary in the lawsuit such that the adver-

sary may assert a cause of action for negligence against the opposing attorney.

> 3. The litigation privilege is generally applicable to bar a civil litigant's claim for civil damages against an opposing party's attorney if the alleged act of the attorney occurs in the course of the attorney's representation of an opposing party and is conduct related to the civil action.

218 W.Va. 427, 624 S.E.2d 864. Mr. Hayhurst's brief neglected to mention that the decision in *Clark* recognized an exception to the litigation privilege. *Clark* stated "[w]here an attorney files suit without reasonable or probable cause with the intent to harm a defendant, we do not believe the litigation privilege should insulate him or her from liability for malicious prosecution." *Clark,* 218 W.Va. at 434, 624 S.E.2d at 871. Thus, it is clear that, under *Clark,* a nonclient may sue an attorney for malicious prosecution. Moreover, the issue of whether Mr. Boggs can sue Mr. Hayhurst is not before this Court. Our concern is CIC's obligation to provide coverage for the claims.

*surance Co.,* 46 F.Supp.2d 1319 (S.D.Fla. 1999). In that case, a Florida attorney was sued by a nonclient for, *inter alia,* malicious prosecution as a result of the attorney's conduct in a prior suit against the nonclient. The attorney had a Business Insurance Policy. The insurer denied coverage on the grounds that the insurance policy excluded coverage for personal injuries arising out of the rendering of, or failure to render, professional services. The attorney filed a declaratory judgment action seeking to determine whether coverage existed. The attorney argued that the professional services exclusion only applied to claims brought against him by his clients. The federal district court, in rendering summary judgment in favor of the insurer, disagreed with the attorney as follows:

> Several courts in other jurisdictions have considered and rejected the argument that the professional services exclusion does not apply where the underlying complaint alleges liability and injuries to a nonclient.... Reasoning that nothing in the language of the professional services exclusion limits the exclusion to claims brought by clients of the professional, these courts have refused to impose a limitation on the term "professional service" that is not set forth in the policy itself....
>
> . . . .
>
> The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standards. [sic] The commercial aspect involves the setting up and running of a business, *i.e.,* securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other.
>
> ... Given the dual nature of the practice of law, an attorney's liability for an action should be assessed depending on the par-

ticular role he was performing at the time the alleged liability arose....

> . . . .
>
> In this case, the complaint does not allege that [the attorney] committed a negligent or intentional act incidental to running the commercial aspect of his business. All of the allegations flow directly from [the attorney's] professional decisions while rendering legal services to [his client]. If the legal services had not been provided, *no injury would have occurred.*
>
> . . . .
>
> The claims brought by [the nonclient] are excluded from the policy's coverage because they fall within the Professional Services Exclusion. Accordingly, [the attorney's] Motion for Summary Judgment is denied; [the insurer's] Motion for Summary Judgment is granted. [The insurer] does not have a duty to [defend] or indemnify [the attorney] on any of the claims.

*Vogelsang,* 46 F.Supp.2d at 1321–23 (internal citations omitted) (quoting *Harad,* 839 F.2d at 985).

We agree with the courts in *Harad* and *Vogelsang* and hold that, as a general matter, in the absence of policy language to the contrary, a professional services exclusion in a commercial general liability policy applies to claims asserted by an insured's client, or a nonclient, for harm arising out of professional services rendered by the insured.

In this case, Mr. Boggs was not Mr. Hayhurst's client. Mr. Boggs sued Mr. Hayhurst because of legal services Mr. Hayhurst rendered as an attorney to his client, Camden–Clark. The commercial general liability policy unambiguously excluded coverage for harm caused by Mr. Hayhurst in rendering professional services, and the policy did not contain any language that limited its exclusion to claims asserted by Mr. Hayhurst's clients.

In sum, the commercial general liability policy issued by CIC does not cover the malicious prosecution claims brought against Mr. Hayhurst by Mr. Boggs.[20]

---

**20.** Mr. Hayhurst and Mr. Boggs contend that denying coverage in this case renders the commercial general liability policy meaningless. Mr.

Hayhurst's brief has cited to a case which purportedly stands for the proposition that, if a professional services exclusion renders a policy

*B. Personal Umbrella Liability Policy*

 The second issue we address is whether the personal umbrella liability poli-

cy[21] provides coverage for the malicious prosecution claims asserted against Mr. Hayhurst. The relevant provisions of the policy are as follows:

---

## 7. SCHEDULE A—SCHEDULE OF UNDERLYING INSURANCE

It is agreed by the Named Insured and their "relatives" the following minimum limits of "underlying insurance" are in force as of the inception date of this policy and will be maintained during the term of this policy:

| Underlying Insurance: | Underlying Limit: |
|---|---|
| A. Automobile Liability: | Bodily Injury and Property Damage combined $500,000. each occurrence |
| B. Comprehensive Personal Liability or Homeowners | Bodily Injury, Property Damage and Personal Injury combined $500,000. each occurrence |

---

### SECTION I—COVERAGE

#### A. Insuring Agreement

1. We will provide the insurance described in this policy. You agree to pay the premium and to comply with the provisions and conditions of this policy.

2. We will pay on behalf of the "insured" the "ultimate net loss" which the "insured" is legally obligated to pay as damages for ... "personal injury" arising

out of an "occurrence" to which this insurance applies:

a. Which is in excess of the "underlying insurance"; or

b. Which is either excluded or not covered by "underlying insurance".

. . . .

#### B. Exclusions
This insurance does not apply to:

. . . .

13. Professional Liability

meaningless, coverage will be afforded. *See Isle of Palms Pest Control Co. v. Monticello Ins. Co.,* 319 S.C. 12, 459 S.E.2d 318, 321 (S.C.Ct.App. 1994) (holding that professional services exclusion that applied to inspecting homes and issuing termite letters, but not to actual termite exterminating services, rendered policy meaningless). We have reviewed the *Isle of Palms* case and do not disagree with the decision under its limited factual context. However, we disagree with the argument that the policy in the instant case is meaningless because of the professional services exclusion. For example, if Mr. Boggs had sued Mr. Hayhurst because he fell at Mr. Hayhurst's office, the policy would presumptively apply, and CIC would have a duty to defend, because that was the type of business liability coverage Mr. Hayhurst purchased.

21. "Although the terms 'excess insurance' and 'umbrella policy' have been used interchangeably by some courts, they are distinct terms of art within the insurance business." *Tscherne v. Nationwide Mut. Ins. Co.,* No. 81620, 2003 WL 22724630, at *3 (Ohio Ct.App. Nov. 20, 2003). Consequently, at this point we should note the distinction that is made between an umbrella policy and an excess liability policy:

Both umbrella and excess liability insurance policies serve to augment primary comprehen-

sive general liability insurance coverage. Umbrella policies and excess policies serve related but distinct purposes. Umbrella policies generally provide the broadest insurance coverage available. As such, umbrella policies serve dual functions: (1) to act as excess insurance in situations where comprehensive general liability or other primary coverage limits have been exhausted; and (2) to drop down and pay claims that fall outside of the coverage provided by the insured's primary insurance program.

Like umbrella policies, excess policies provide excess insurance in situations where primary limits have been exhausted. However, excess policies differ from umbrella policies in two significant ways. First, unlike umbrella policies, excess policies do not provide broader insurance coverage than the relevant primary policies. Instead, excess policies are typically following-form instruments that incorporate by reference the terms of the underlying policies unless there is a specific term to the contrary in the excess policy. Second, excess policies do not have a drop-down feature whereby they act as primary insurance policies for occurrences not covered by the primary policies. *Scottsdale Ins. Co. v. Safeco Ins. Co. of Am.,* 111 F.Supp.2d 1273, 1277–78 (M.D.Ala.2000) (internal citations omitted).

"[P]ersonal injury" arising out of any act, malpractice, error or omission committed by any "insured" in the conduct of any profession or "business", even if covered by "underlying insurance".

### SECTION IV—DEFINITIONS

. . . .

I. "Personal injury" means injury other than "bodily injury" arising out of one or more of the following offenses:

. . . .

4. Malicious prosecution.

Mr. Hayhurst and Mr. Boggs have argued that the term "professional liability" in the umbrella policy is ambiguous, that the policy is illusory, and that the professional liability exclusion applies only to claims against Mr. Hayhurst by one of his clients. We will discuss each of these issues separately.

(1) **The term "professional liability" in the personal umbrella liability policy.** Mr. Hayhurst and Mr. Boggs contend that the term "professional liability" is ambiguous because it is not defined. Therefore, they argue that the professional liability exclusion does not apply.[22] We summarily reject this argument. The umbrella policy states that professional liability is a " 'personal injury' arising out of any act, malpractice, error or omission committed by any 'insured' in the conduct of any profession[.]" Under the plain language of the exclusion, the policy does not provide coverage for any act arising out of Mr. Hayhurst's profession, *i.e.,* conduct by him as an attorney. Because we find the term "professional liability" is, on its face, "susceptible to only one reasonable interpretation, we find it unambiguous." *Carolina Cas. Ins. Co. v. Draper & Goldberg,* 138

Fed.Appx. 542, 548 (4th Cir.2005). *Id.* ("The plain and ordinary meaning of the words 'professional liability claim' encompasses any type of claim attempting to assert liability against the applicant law firm arising out of its rendering of legal services."). *See also Schultheis v. Centennial Ins. Co.,* 108 Misc.2d 725, 438 N.Y.S.2d 687, 688 (1981) ("The rider agreement defines 'Professional Liability' to mean 'injury arising out of malpractice, error or mistake in rendering and failing to render professional services in the practice of the named insured's profession[.]' ").[23] Thus, we further hold that the term "professional liability" contained in a personal umbrella policy that excludes a personal injury arising out of any act, malpractice, error or omission committed by an insured in the conduct of any profession, means those services rendered by an insured with particularized knowledge or skill in his or her chosen field.

(2) **Whether the personal umbrella liability policy is illusory.** Mr. Hayhurst and Mr. Boggs have also argued that a denial of coverage under the umbrella policy would, in effect, make the policy illusory. To support this argument, Mr. Hayhurst cited to the decision in *Davidson v. Cincinnati Insurance Co.,* 572 N.E.2d 502 (Ind.Ct.App.1991).[24]

In *Davidson,* the insured sued a defendant over damage to property that the insured rented to the defendant. After that case was resolved, the defendant filed a suit against the insured alleging, among other things, a claim for malicious prosecution and slander. The insurer filed a declaratory judgment action seeking to have the trial court determine that coverage did not exist under two property damage policies and two umbrella policies

---

**22.** In the final analysis, this argument is merely a repeat attempt at challenging the meaning of "professional services," which we have previously rejected in this opinion.

**23.** Mr. Hayhurst and Mr. Boggs also have argued that, because of the ambiguity in the term "professional liability," Mr. Hayhurst had a reasonable expectation of coverage. Insofar as we have determined that no ambiguity exists in the term "professional liability," the doctrine of reasonable expectation does not apply for the reasons set out under the discussion of the commercial general liability policy. *See Blake v. State Farm Mut. Auto. Ins. Co.,* 224 W.Va. 317, 325 n. 6, 685

S.E.2d 895, 903 n. 6 (2009) ("Because the Court determines that there is no ambiguity in the State Farm policy language at issue, there can be no reasonable expectation of insurance coverage.").

**24.** Mr. Hayhurst also cited to the decision in *Clark–Peterson Co., Inc. v. Independent Insurance Associates Ltd.,* 492 N.W.2d 675 (Iowa 1992). The court in *Clark–Peterson* refused to uphold a policy exclusion for "discrimination" because the parties had agreed to have coverage for discrimination claims. The decision in *Clark–Peterson* is simply not relevant to the instant case.

it had issued to the insured.[25] The trial court found that coverage did not exist and granted summary judgment to the insurer. The insured appealed. On appeal, the court found that coverage did not exist under the two property damage policies, even though the policies defined personal injury as including malicious prosecution and slander, because the injury did not arise out of the operation of the insured's business. However, the appellate court found that coverage existed under the two umbrella policies.

The umbrella policy language that was at issue in *Davidson* involved the definition of "occurrence." Under the umbrella policy in *Davidson*, an occurrence was defined as a claim which "unexpectedly or unintentionally" resulted in personal injury. The insurer contended that a claim for malicious prosecution and slander involve intentional acts; therefore, injury from such conduct would not be unexpected or unintentional. The insured argued that coverage should be extended because the policy would be rendered meaningless for any claim that did not involve unexpected or unintentional harm. The appellate court in *Davidson* agreed with the insured and tersely stated:

> Provisions in an insurance policy, which are unambiguous when read within the policy as a whole, but in effect, provide only illusory coverage, should be enforced to satisfy the reasonable expectations of the insured. Since [the insured] could have reasonably expected [the insurer] to defend him in the action brought by Hardin against him, in part, for malicious prosecution and slander, [the insurer] should have to provide a defense for him. The trial court erred in granting summary judgment in favor of [the insurer] and is hereby reversed.

*Davidson*, 572 N.E.2d at 508.

The resolution of the umbrella policy issue in *Davidson* has no bearing on the facts of this case.[26] The principle concern in *Davidson* was that the umbrella policy essentially denied coverage for any injury that would be expected to occur from any conduct. The court in *Davidson* found that the broad requirement that an injury be "unexpected or unintentional" made the policy illusory. In the instant proceeding, the umbrella policy is not illusory, nor have we been called upon to determine what the definition of "occurrence" means. Under the umbrella policy in this case, coverage is presumptively provided to Mr. Hayhurst for conduct causing injury that did not result from his work as an attorney. For example, if Mr. Hayhurst "personally" sued Mr. Boggs for any injury Mr. Boggs allegedly caused him, and Mr. Boggs later filed a malicious prosecution claim arising from Mr. Hayhurst's personal suit, the professional liability exclusion simply would not apply. In this situation, the umbrella policy would provide coverage if the claim against Mr. Hayhurst was not covered by the underlying insurance policies, or sought an amount in excess of the underlying policies. *See State Farm Fire & Cas. Ins. Co. v. First Nat'l Bank of Madison County*, 969 F.2d 521, 525 (7th Cir.1992) ("One would expect a personal umbrella policy to give more protection to personal risks than to business risks. One would also expect a significant premium increase if business risks were included in the coverage."). In summary, we find that the personal umbrella liability policy was not illusory and would provide coverage under the appropriate circumstances.

■■ **(3) The professional liability exclusion in the personal umbrella liability policy.** Finally, Mr. Hayhurst and Mr. Boggs argued that the umbrella policy's professional liability exclusion should not apply because "there is no question that Mr. Boggs' suit seeks to impose no 'professional liability' on [Mr. Hayhurst]." It is further argued that "[t]hrough its use of the terms 'professional liability,' 'malpractice,' 'error,' and 'omission,' the exclusion ... reasonably

---

**25.** CIC was also the insurer in *Davidson*.

**26.** Mr. Hayhurst also relied on another case that is not relevant to the facts in this case. *See Insurance Co. of N. Am. v. Milberg Weiss Bershad Specthrie & Lerach*, No. 95 Civ. 3722(LLS), 1996 WL 520902 (S.D.N.Y. Sept.12, 1996) (insurer filed action to reform insurance contracts to include professional services exclusion that parties allegedly contemplated but which was not inserted in policies issued).

conveys that the personal umbrella policy would apply to 'professional liability' claims, for example, by Mr. Hayhurst's clients." This argument is similar to an argument made under the commercial general liability policy discussion.[27]

The umbrella policy contains an unambiguous professional liability exclusion for personal injury that "aris[es] out of *any act*, malpractice, error or omission committed by any 'insured' in the conduct of any profession[.]" (Emphasis added). Nothing in this exclusion warrants a reasonable belief that it applies only to claims by a professional's clients. *See Tri–Etch, Inc. v. Cincinnati Ins Co.*, 909 N.E.2d 997, 1003 (Ind.2009) ("Nothing in the language of the professional services exclusion ... limits the exclusion to claims brought by the clients of the professional, *i.e.*, to first party claims. The exclusion here applies to damages or liability "due to any service of a professional nature" and does not require privity between the insured and the claimant.' *Erie Ins. Group v. Alliance Envtl., Inc.*, 921 F.Supp. 537, 542 (S.D.Ind.1996).''). In this case, Mr. Boggs has alleged claims for malicious prosecution that arose out of Mr. Hayhurst's conduct as an attorney for Camden–Clark. Consequently, the exclusion applies. *See Royal Ins. Co. of Am. v. Medical Evaluation Specialists*, No. 95–75412, 1996 WL 33406032 (E.D.Mich. Oct.10, 1996) (upholding professional services exclusion in personal umbrella policy); *St. Paul Fire & Marine Ins. Co. v. Roach Bros. Co.*, 639 F.Supp. 134 (E.D.Pa. 1986) (same). Moreover, consistent with our holding under the commercial general liability policy, we hold that, as a general matter, in the absence of policy language to the contrary, a professional liability exclusion in a personal umbrella policy applies to claims asserted by an insured's client, or a non-client, for harm arising out of professional services rendered by the insured.[28]

---

27. Mr. Hayhurst has cited to the definition of medical professional liability under our Medical Professional Liability Act to argue that " 'professional liability insurance' is designed to provide a defense and indemnification for claims made by the clients and customers of professionals who allege breach of a professional, rather than a common law standard of care." This argument follows no logical reasoning. First, the umbrella policy is not a professional liability policy. Second, this Court has expressly recognized that a nonpatient may bring a cause of action against a healthcare provider. *See* Syl. pt. 5, *Osborne v. United States*, 211 W.Va. 667, 567 S.E.2d 677 (2002) ("The West Virginia Medical Professional Liability Act, W. Va.Code § 55–7B–1, *et seq.*, permits a third party to bring a cause of action against a health care provider for foreseeable injuries that were proximately caused by the health care provider's negligent treatment of a tortfeasor patient."). Third, although the Legislature enacted W. Va.Code § 55–7B–9b (2003) (Repl.Vol.2008) to limit the decision in *Osborne* by requiring a nonpatient to establish that his or her harm was caused by willful and wanton or reckless conduct, this statute nevertheless provides that "[n]othing in this section shall ... prevent a derivative claim for loss of consortium arising from injury or death to the patient[.]" W. Va.Code § 55–7B–9b. In sum, a nonpatient may sue a healthcare provider under the requirements of the Medical Professional Liability Act, even though the healthcare provider did not render any services to the nonpatient. Mr. Hayhurst's argument is, therefore, without merit.

28. The final issue raised by Mr. Hayhurst and Mr. Boggs is that the umbrella policy should "drop down" to cover the malicious prosecution claims, because the underlying automobile and homeowner policies do not provide coverage. To support this contention, Mr. Hayhurst cites to the decision in *Duff Supply Co. v. Crum & Forster Insurance Co.*, No. Civ. A. 96–8481, 1997 WL 255483 (E.D.Pa. May 8, 1997). We summarily reject the drop down argument for two reasons. First, the decision in *Duff Supply* is inapplicable, because it did not involve a professional liability exclusion. More importantly, in *Duff Supply*, it was determined that certain claims were, in fact, excluded by the umbrella policy, while one claim for bodily injury was not excluded. Second, an umbrella policy does not automatically drop down. In order for an umbrella policy to drop down, it must be determined that none of its exclusions apply. To the contrary, we have "determined that an enforceable exclusion in the umbrella policy precluded coverage in this case." *Allstate Ins. Co. v. Covalt*, 321 Fed.Appx. 717, 719 (10th Cir.2009). Consequently, the exclusion prevents the umbrella policy from dropping down. *See State Farm Fire & Cas. Ins. Co. v. First Nat'l Bank of Madison County*, 969 F.2d 521 (7th Cir.1992) (upholding exclusion in personal umbrella policy); *Westfield Ins. Co. v. Holland*, No. 07–5496, 2008 WL 5378267 (E.D.Pa. Dec.19, 2008) (same); *Allstate Ins. Co. v. Melton*, 482 F.Supp.2d 775 (S.D.Miss.2007) (same); *RLI Ins. Co. v. Audubon Indem. Co.*, No. 4:04CV276–D–B, 2007 WL 2979638 (N.D.Miss. Oct.11, 2007) (same); *American Nat'l Prop. & Cas. Co. v. Blocker*, 165 F.Supp.2d 1288 (S.D.Ala.2001) (same); *In re San Juan Dupont Plaza Hotel Fire Litig.*, 789 F.Supp. 1212 (D.Puerto Rico 1992) (same); *Uhrich v. State Farm Fire & Cas. Co.*, 109 Cal.

## IV.

### CONCLUSION

To summarize, we answer the questions certified by the Circuit Court of Wood County, as reformulated into a single question, as follows:

Does the commercial general liability policy or the personal umbrella liability policy issued by CIC to Mr. Hayhurst cover the claims for malicious prosecution asserted by Mr. Boggs against Mr. Hayhurst?

Answer: No

Having answered the foregoing certified questions, as reformulated, we remand this matter to the Circuit Court of Wood County for further proceedings consistent with this opinion.

Certified Questions Answered.

App.4th 598, 135 Cal.Rptr.2d 131 (2003) (same); *Abram v. United Servs. Auto. Ass'n,* 395 Ill.App.3d 700, 334 Ill.Dec. 287, 916 N.E.2d 1175 (2009) (same); *Shelter Mut. Ins. Co. v. Ballew,* 203 S.W.3d 789 (Mo.Ct.App.2006) (same); *Weitz v.* *Allstate Ins. Co.,* 273 N.J.Super. 548, 642 A.2d 1040 (1994) (same); *Pielhau v. RLI Ins. Co.,* 144 N.M. 554, 189 P.3d 687 (N.M.Ct.App.2008) (same); *National Farmers Union Prop. & Cas. Co. v. Kovash,* 452 N.W.2d 307 (N.D.1990) (same).