318 S.E.2d 40

**Josefina M. ORTEZA**

v.

**The MONONGALIA COUNTY GENERAL HOSPITAL.**

**No. 15936.**

Supreme Court of Appeals of West Virginia.

March 2, 1984.

Rehearing Denied April 11, 1984.

Steptoe & Johnson, Herbert G. Underwood and William E. Galeota, Clarksburg, Robert W. Dinsmore, Morgantown, for appellant.

Franklin D. Cleckley, Robert B. Stone, Morgantown, for appellee.

NEELY, Justice:

Dr. Josefina M. Orteza is a Board-certified, anatomical pathologist. She was hired by the Monongalia General Hospital Company in October, 1977 as an associate pathologist. The terms of Dr. Orteza's employment were set forth in a written contract that resulted from negotiations between Dr. Orteza and the hospital during which both parties were represented by counsel. Under the terms of Dr. Orteza's employment contract both the hospital and Dr. Orteza could terminate her employment upon 120 days notice to the other party.

In October, 1979, Dr. Joseph F. Nataro, the Director of Laboratories for Monongalia General Hospital, notified Dr. Orteza by letter that her employment would be terminated 120 days hence, and her obligation to work between the date of notice and the date of termination was waived by the hospital. She was paid her salary and benefits up to the effective termination date of 14 February 1980.

On 12 June 1980 Dr. Orteza sued the Monongalia General Hospital and Dr. Nataro in the Circuit Court of Monongalia County alleging that her discharge was illegal because she had been denied due process under the *United States Constitution* and the *West Virginia Constitution*. Dr. Orteza also claimed that her contract had been breached and that she was entitled to damages on that count. After four days of trial the case went to the jury on 18 June 1982 with instructions from the court that the jury should return a verdict in favor of Dr. Orteza on the issue of denial of constitutional due process along with other instructions on Dr. Orteza's breach of contract claim. The next day the jury returned a general verdict in favor of Dr. Orteza awarding $180,000 in compensatory damages and $200,000 in punitive damages. Since there were no special interrogatories, it is unclear whether the jury based their verdict on the due process claim or the contract claim or both. On 26 January 1983 the trial court overruled the Hospital Company's motion for a new trial and sustained Dr. Orteza's post-trial motion for reinstatement and back pay in addition to the damages awarded, and entered final judgment. We reverse.

I

The arguments made by both the appellant Hospital Company and the appellee, Dr. Orteza, are complex, but this case is essentially a contract dispute. Although there is a potential issue of constitutional due process deprivation because it is argued that the hospital is an instrumentality of the State of West Virginia, the most important element in this entire case is paragraph 8 of Dr. Orteza's employment contract which governs the subject of termination and provides in its entirety as follows:

"This Agreement shall continue for one year from the date hereof and thereafter from year to year until terminated, but it may be terminated at any time by the HOSPITAL or the ASSOCIATE PATHOLOGIST by giving 120 days written notice to the other of the intention to terminate prior to the intended date of termination. If the ASSOCIATE PATHOLOGIST is terminated by the HOSPITAL, she shall automatically lose her privilege to practice in or at the HOSPITAL. As an employee of the HOSPITAL, the ASSOCIATE PATHOLOGIST will utilize the Hospital Grievance Procedure as outlined in the "Hospital Personnel Policies" for administrative, contrac-

tural [sic] and business procedure problems which are not of a medical nature and cannot otherwise be satisfactorily resolved. If problems arise which cannot be satisfactorily resolved and which are medical in nature, the ASSOCIATE PATHOLOGIST is to utilize the grievance procedure outlined in the Medical Staff By-Laws as presently exist or are hereafter adopted.

It has long been settled law that "It is the province of the court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937). We have also ruled that, "Where the terms of a contract are clear and unambiguous, they must be applied and not construed." Syl. Pt. 2, *Bethlehem Mines Corporation v. Haden*, 153 W.Va. 721, 172 S.E.2d 126 (1969). Paragraph 8 of Dr. Orteza's contract could not be clearer: it provides that either the hospital or the associate pathologist may terminate the contract after one year upon 120 days written notice. The parties stipulate that Dr. Orteza was given 120 days written notice and was paid her salary and benefits during the notice period although she was not required to work. The trial court erred in allowing the jury to construe a contractual provision that was unambiguous on its face.

Dr. Orteza points to the provisions in paragraph 8 that relate to the hospital grievance procedure for administrative grievances as outlined in the Hospital Personnel Policies and the grievance procedure for grievances that are medical in nature outlined in the Medical Staff By-laws. Dr. Orteza argues, and the circuit court held, that Dr. Orteza's discharge was for medical reasons and that the grievance procedure outlined in the Medical Staff By-laws had not been followed.

We find that the plain purport of paragraph 8 is that either the Hospital Company or Dr. Orteza can terminate employment upon 120 days written notice regardless of the reason for termination. In this regard, we are in accord with Judge Zacharis of the United States Court for the Eastern District of Virginia who recently ruled that "Agreements are not necessarily ambiguous because the parties disagree as to the meaning of the language of the agreement." *Richardson v. Econo-Travel Motor Hotel Corp.*, 553 F.Supp. 320 (E.D. Va.1982).

The provisions in paragraph 8 that relate to grievances are designed to provide Dr. Orteza with a regular procedure for resolving any disputes that arise during her term of employment about either administrative or medical matters. If it had been the intention of the parties to provide that discharge could be effected only for good cause, they would have said so. Under the contract Dr. Orteza had a right to use either the administrative or medical grievance procedures of the hospital for all problems arising in the course of her employment, but her employment itself was entirely within the discretion of the Hospital Company. By giving written notice 120 days before termination the Hospital Company complied with its contractual obligations. There was no breach.

II

The circuit court directed a verdict for Dr. Orteza on her claim that the discharge was accomplished in violation of her due process rights. This claim is founded upon the arguable proposition that the Monongalia General Hospital is an instrumentality of the State of West Virginia and therefore any action that it takes constitutes "state action." The Hospital Company does, indeed, have numerous governmental attributes. In 1976 the Monongalia General Hospital Company was incorporated by private individuals. However, with the assent of the Monongalia County Commission, the predecessor Hospital Board of Trustees of a county owned and operated hospital was dissolved, and its assets transferred to a Building Commission and leased to the appellant private corporation.

The appellant hospital is housed in facilities that are owned by the Monongalia County Building Commission, a public body, and leased to the private hospital corporation. The hospital must make periodic financial reports to the county, which

can then review them to insure proper management of the hospital. Moreover, the Monongalia County Building Commission exercises real and substantial power over the selection of members of the appellant's Board of Trustees. According to the Hospital's by-laws, the Board of Trustees submits three names to the Building Commission, which then has thirty days to select one of the nominees, if it finds one to be acceptable. The Building Commission is a public body, an agency of the County Commission created specifically by the latter to accommodate the construction and administration of Monongalia General Hospital.

Furthermore the hospital has been and remains dependent on public resources for its operation. Public funds financed nearly all of the construction of the appellant's physical plant and the county established the Building Commission specifically to secure funding from the Farmers' Home Administration. The Building Commission issued bonds to help finance construction, and the hospital derives more than one third of its revenue from governmental sources. At the time this case was tried the hospital also participated in the West Virginia Public Employees Retirement Plan, which through joint state and employee contributions, provides pension benefits to state employees. The appellant enjoys tax-exempt status and during a substantial period of appellee's employment, the hospital escaped state fees on its vehicles by using county license plates. Finally, under the corporate charter of the appellant hospital, in the event that the corporation is dissolved all assets revert to the Monongalia County Commission, and when the construction bonds are repaid, the property on which the hospital is located will revert to the county.

Having said all of that, however, it should also be noted that Monongalia General Hospital has several important private characteristics. The hospital was incorporated by private individuals in 1976 as a conscious decision to move the facility away from the political arena and to make it a more attractive recipient of revenue bond funding. Thus, the hospital's private status can be seen as a necessary factor in its continued existence. Secondly, the Hospital Company receives no funding from the County Commission nor does it receive other direct payments from the state. Finally, the Hospital Company is classified by the Internal Revenue Service as a private, not-for-profit corporation. These characteristics are not without significance. In fact, this Court has stated:

> [A] hospital, although operated solely for the benefit of the public and not for profit, is nevertheless a private institution if founded and maintained by a private corporation with authority to elect its own officers and directors....

*State ex rel. SAMF v. Ohio Valley General Hospital Assoc.*, 149 W.Va. 229, 233, 140 S.E.2d 457, 460 (1965), quoting *Levin v. Sinai Hospital of Baltimore City, Inc.*, 186 Md. 174, 46 A.2d 298 (1946).

The difficulty in determining whether particular institutions are public or private for purposes of the Fourteenth Amendment has led courts to adopt a more focused standard. Rather than looking to whether a particular entity is in its totality public or private, courts now look at the level of state involvement in the particular activity that is the basis of dispute. In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Supreme Court held that there must be some direct connection or nexus between the state and the specific action that is being challenged. In that case, the Court held that a public utility's decision to terminate electric service for non-payment did not constitute state action, even though the utility was state-regulated, because there was no nexus between state regulation and the specific act of service termination. State involvement with a corporate entity without state responsibility for a particular activity did not establish state action for purposes of the Fourteenth Amendment.

In applying this analysis to hospitals, the 4th Circuit held in *Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir.1982), that a hospital was involved in state action only when it acted (1) in an

exclusively state capacity; (2) for the state's direct benefit; or (3) at the state's specific behest. Under this analysis, the Court found that the staff privileges decisions of a hospital were not state action despite the fact that the institution received Hill-Burton Act funds, accepted Medicare and Medicaid patients and reported privileges revocations to state medical licensing authorities.

The recent case of *Thompson v. Charleston Area Medical Center, Inc.,* 539 F.Supp. 671 (S.D.W.Va.1982), involved facts quite similar to those of the instant case. The case involved the dismissal of a teaching nurse at the hospital's school of anesthesia who claimed that her dismissal had been in violation of due process. The hospital in *Thompson* not only received Hill-Burton funds, accepted Medicare and Medicaid patients, and reported privileges revocations to the state medical licensing authority; it also leased its premises from the local county which had issued revenue bonds to finance the hospital's construction. Indeed, the hospital in *Thompson, supra,* had an even closer relationship with the state than the Monongalia General Hospital in that it enjoyed a special relationship with West Virginia University and its medical school. Nevertheless, Judge Copenhaver applied the test outlined in *Modaber, supra,* and determined that a non-profit hospital does not function as a state actor when it makes a personnel decision.

Two recent United States Supreme Court cases are also noteworthy in that they indicate the trend away from finding state action in all cases where institutions rely on state funds. *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), involved a private school for problem high school students which received over ninety percent of its funding from governmental sources and which was also the subject of extensive governmental regulation. When dismissed teachers sued the school alleging that their discharge was in violation of constitutionally protected procedural rights, the Supreme Court ruled that the case did not involve state action. Chief Justice Burger articulated four considerations in the Court's decision: (1) the school's receipt of public funds did not make its personnel decision an act of the state; (2) none of the extensive governmental regulations of the school were applicable to personnel matters; (3) the fact that the school was serving a public function was not determinative; and (4) there was no "symbiotic relationship" between the school and the state that made the school different from a private contractor.

In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Supreme Court ruled that the transfer of medicaid patients to lower levels of care by a private nursing home did not constitute state action. Justice Rehnquist pointed to three requirements for a finding of state action: (1) a sufficiently close nexus between the state and the conduct of the regulated private entity; (2) exercise of coercive power or significant encouragement by the state which led the private entity to act in the challenged manner; and, (3) a private entity exercising powers that are "traditionally the exclusive prerogative of the state."

Certainly the appellant Hospital Company lies somewhere in the twilight zone between a government instrumentality and a private charity. The record does not establish any nexus between the state and the Hospital Company's personnel decisions, and the trend in state action decisions would seem to be away from finding state action in cases involving personnel at quasi-public institutions. Nevertheless, we shall assume *arguendo,* that the hospital is a public agency for our purposes here and analyze the case before us from that point of view.[1]

## A.

■ The threshold question in any claim of due process deprivation is isolation of

---

1. We emphasize that today's decision does not hold Monongalia General Hospital or similar institutions are or are not engaged in state action when they make personnel or other administrative decisions. It is not necessary for us to decide that question in this case. Our discussion of recent cases in this area is intended only to help parties and courts focus their arguments on the relevant factors in future cases.

the property interest or liberty interest that the plaintiff alleges was at stake. The Supreme Court of the United States has specifically addressed the types of interests or entitlements arising under employment contracts that are protected by constitutional due process safeguards. In *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court considered the claim of a police officer discharged from his employment and noted that in order to show a due process deprivation, either a property or a liberty interest had to be at stake. With regard to the property interest claimed by the officer in *Bishop,* the Court looked to North Carolina state law and determined that the ordinance defining the officer's rights established only an employment relationship terminable at will.

 In Dr. Orteza's case, the property right that the appellee claims was deprived was created under a contract that specifically provided for termination upon 120 days written notice. The property interests that are protected by the Constitution can be created and defined only by reference to state law. *Bishop, supra,* at 344, 96 S.Ct. at 2077; *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In the same way that the plaintiff in *Bishop* could show no protected property interest, the appellee in this case is able to show no protected property interest. As this Court said in *Major v. DeFrench,* 169 W.Va. 241, 286 S.E.2d 688, 695 (1982): "A 'property' interest protected by due process must derive from private contract or state law, and must be more than a unilateral expectation of continued employment."

### B.

 Having found no protectable property interest that was confounded by the actions of the appellant in this case, we must now inquire whether there was a protected liberty interest that has been unconstitutionally denied. As we said in *Major v. DeFrench, supra,* 169 W.Va. at 254, 286 S.E.2d at 696: "It has long been recognized that one of the liberty interests protected by due process is a person's interest in the pursuit of a lawful occupation." However, the case before us is readily distinguishable from cases such as *Major, supra; McLendon v. Morton,* 162 W.Va. 431, 249 S.E.2d 919 (1978); and *Waite v. Civil Service Comm.,* 161 W.Va. 154, 241 S.E.2d 164 (1977). The employees in those cases were not professional personnel; they were hired pursuant to a general statutory Civil Service or Board of Regents scheme; and, they did not have individualized contracts of employment. The distinction between Dr. Orteza's position and that of an ordinary state employee can be gleaned readily from our language in *Major, supra,* 169 W.Va. at 255, 286 S.E.2d at 697:

"Because government is the employer in such cases, there will necessarily be a state-derived decision directly effecting an individual's ability to pursue her chosen occupation.

This Court has traditionally shown great sensitivity for the due process interests of the government employee by requiring substantial due process protections and imposing rational decision-making on the state employer."

 Dr. Orteza is not in the same position as an ordinary civil service, government employee who has a legitimate expectation of continued employment during good behavior, and whose training usually qualifies him or her primarily for work with the government. Dr. Orteza is a licensed medical doctor who has had her own private practice, and who has worked both in hospitals and universities here and abroad. If she loses an arguably public job, there is considerable demand for her professional medical services in the private sector.

Furthermore, during all of the discussions about her employment termination at the hospital no one disparaged Dr. Orteza's professional ability. We recognized in *Major, supra,* 169 W.Va. at 256, 286 S.E.2d at 697, that "[T]he government cannot dismiss an employee on charges that call into question her good name, or that impose a stigma upon an employee which could foreclose her freedom to pursue other employment opportunities, without providing the employee notice of the charges against her

and a hearing in which the factual basis of the charges can be contested." In the case before us the hospital authorities were inordinately careful to protect Dr. Orteza's professional standing. A committee of the medical staff to which the whole subject of Dr. Orteza's discharge was referred specifically concluded that the reasons for her discharge were entirely administrative and unrelated to her professional competence as a doctor. The committee reported as follows:

"The problems cited in the letter of termination are administrative. We had considerable discussion regarding the point of efficient use of time, but have reached the final conclusion that there is no clinical component involved in her dismissal. However, we wish to state that there has been a concensus of opinion by the staff that her pathological and clinical abilities are excellent and have been of great value to the staff. We deeply regret that we have had to perform this function."

Consequently we find that Dr. Orteza possessed no liberty interest that was jeopardized by the hospital's actions. The hospital's decision in the case of her employment in no way diminished her opportunities to pursue her profession elsewhere nor did it call into question her competence as a physician.

### III

Finally, it is worth pointing out that although the contract did not require the hospital to afford Dr. Orteza an opportunity to use either the administrative or the medical grievance procedures to challenge her discharge, the hospital nonetheless went through both of those procedures. Initially, Mr. Woodrum, the chief executive officer of the hospital, convened an *ad hoc* committee consisting of three staff doctors to hear Dr. Orteza's allegations that her discharge was based on medical grounds that were erroneous. After giving Dr. Orteza an opportunity for a hearing, the medical committee submitted a report to Mr. Woodrum in which they specifically found that the grounds for discharge were administrative in nature. At that point, Mr. Woodrum permitted Dr. Orteza to pur-

sue the administrative grievance procedure. He allowed Dr. Orteza a full hearing, and he then made numerous, specific findings of fact that supported her discharge. Although Mr. Woodrum's inquiry into the circumstances surrounding Dr. Orteza's discharge did not have the solemnity of a proceeding in the Supreme Court of the United States, Dr. Orteza was given an opportunity to present her side of the case. Mr. Woodrum made an independent investigation into the facts surrounding her termination, and gave her a reasoned, written opinion justifying his affirmation of the decision to terminate her.

After reading the entire record in this case we conclude that although the hospital was not required under either its contract or applicable constitutional principles to provide Dr. Orteza with an extensive hearing mechanism before discharging her, the hospital did, indeed, provide such a mechanism and afforded Dr. Orteza all of the due process rights that she asserts were denied her. The appellee's attorneys in their brief before this Court are unable to find any specific flaw in the opportunities to be heard and to present evidence that the hospital gave the appellee. In a nutshell their complaint is that either the result was wrong or she should have had more hearings with more lawyers and more opportunities to appeal. Yet as we said in Syl. Pt. 2 of *North v. West Virginia Board of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977):

The applicable standards for procedural due process, once we leave the criminal area, may depend upon the particular circumstances of a given case. However, there are certain fundamental principles in regard to procedural due process embodied in article III, § 10 of the *W.Va.Const.,* which are: First, the more valuable the rights sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due pro-

cess protection as a permanent deprivation.

Certainly the appellant hospital has met the applicable standard of procedural due process in this case. The appellee is a licensed, professionally trained medical doctor. Her employment contract provided for termination at will. Thus, she had neither a liberty nor a property interest. Nevertheless, she was given a full hearing.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Monongalia County is reversed and the case is remanded with directions to enter judgment on all issues for the defendant.

Reversed and remanded.