**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1557**

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Plaintiff - Appellant,

v.

EZRA LAMBERT; BETTY JEAN HALE,

Defendants - Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Joseph R. Goodwin, Chief District Judge.  (2:08-cv-01158-JRG)

Argued:  November 8, 2011          Decided:  January 20, 2012

Before DUNCAN, WYNN, and DIAZ, Circuit Judges.

Reversed and remanded by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Duncan and Judge Wynn joined.

**ARGUED:** Thomas Paul Mannion, MANNION & GRAY CO., LPA, Cleveland, Ohio, for Appellant.  Brent K. Kesner, KESNER, KESNER & BRAMBLE, Charleston, West Virginia, for Appellees.  **ON BRIEF:** Sylvester A. Hill, Jr., MANNION & GRAY CO., LPA, Cleveland, Ohio, for Appellant.   Christopher J. Heavens, HEAVENS LAW OFFICES, Charleston, West Virginia; Gregory K. Smith, Williamson, West Virginia, for Appellee Betty Jean Hale.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

The district court entered summary judgment in favor of Betty Jean Hale and Ezra Lambert, ruling that Lambert was covered under West Virginia's general insurance policy as a "volunteer worker."  Because we are convinced that Lambert, a prison inmate, cannot possibly meet the definition of "volunteer worker" as found in the policy, we reverse and remand with instructions to enter judgment in favor of the insurer.

I.

A.

Ezra Lambert is an inmate at the Southwestern Regional Jail ("Jail") in West Virginia.  As a sentenced inmate, Lambert is required to work at the Jail.  He may announce a preference from a limited menu of options to fulfill his work obligation, but the assignment is ultimately within the sole discretion of the Jail.  Lambert sought to work in the kitchen, because he wished "[t]o eat extra food and to get out of [his] cell."  J.A. 118. He accordingly submitted a written application to Aramark Correctional Services, Inc., the contractor in charge of kitchen operations.  After interviewing with supervisors from Aramark, Lambert began work in the Jail's kitchen.

Lambert generally worked six days a week for eight hours each day as a cook in the kitchen.  He received no financial

2

benefits from his service. Although Lambert considered himself a volunteer, the Jail's coercive authority over him was ever present. Indeed, the Jail provided Lambert with a stark reminder of its power when it disciplined him for protesting working conditions. Lambert quit work in the middle of a shift in an effort to attract attention to his workplace grievances. The Jail responded by locking him down--i.e., putting him in "the hole"--for five days.

Betty Jean Hale worked with Lambert in the Jail's kitchen, though she was not an inmate. Hale alleges that Lambert injured her on October 6, 2006. According to Hale, Lambert was pushing a cart housing a mixer. As Lambert neared Hale, the mixer fell from the cart, landing on Hale's foot. Hale alleges that she suffered a serious injury and incurred medical expenses as a result.

B.

Pursuant to a comprehensive liability policy ("Policy"), West Virginia obtained insurance coverage from National Union Fire Insurance Company of Pittsburgh, PA. National Union agreed to "pay on behalf of the 'insured' all sums which the 'insured' shall become legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'occurrence.' " J.A. 23. It further

3

assumed "the right and duty to defend any suit against the 'insured' seeking damages on account of such 'bodily injury' or 'property damage.' " Id.

The Policy defined "insured" as "any person or organization qualifying as an insured in the 'persons insured' provision of the applicable insurance coverage." Id. 43. Critical to this dispute, the Policy enumerated the following entities as "persons insured":

(A) The "Named Insured" [i.e., the State of West Virginia],
(B) Any elected or appointed official, executive officer, commissioner, director, or member of the "Named Insured" while acting within the scope of his duties as such,
(C) Any faculty member, employee, volunteer worker or student teacher of the "Named Insured" while acting within the scope of their duties as such.

Id. 25 (emphasis added). This appeal centers on whether Lambert qualifies as a "volunteer worker" for purposes of the Policy.

C.

Hale filed suit in state court in 2007 ("Underlying Action"), alleging various claims arising out of the mixer incident. She named as defendants Lambert, Aramark, the West Virginia Department of Military Affairs and Public Safety, and the West Virginia Regional Jail and Correctional Facility Authority.

4

Notified of Hale's suit, National Union filed a declaratory action in federal court, seeking a declaration that it has no duty to defend or indemnify Lambert with regard to the Underlying Action. "Based on the plain and unambiguous language of [the Policy]," alleged National Union, it "has no contractual duty to defend or provide any other policy benefits to . . . Lambert." J.A. 18. In response, Hale asked the court to declare that Lambert is an "insured" under the Policy and therefore entitled to a defense and indemnification. Lambert independently sought an identical declaration.

National Union and Hale filed competing motions for summary judgment. A single issue confronted the district court--whether Lambert qualified as a "volunteer worker" under the Policy. The court answered that question in the affirmative, first determining that the term was unambiguous and then finding that Lambert "qualifies as a 'volunteer worker' under any reasonable definition of the term." Id. 196. Because Lambert worked without compensation, elected to work in the kitchen rather than elsewhere, and considered himself a volunteer, the court ruled that the term "volunteer worker" encompassed him.

The court accordingly entered judgment in favor of Hale and Lambert ("Appellees"), denying National Union's motion for summary judgment. From this order National Union appeals.

5

II.

We review a grant of summary judgment de novo, applying the same legal standards as the district court. The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). The Federal Rules' familiar command guides our analysis, and summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed R. Civ. P. 56(a).

Appellees admit that Lambert is an "insured" under the Policy--and therefore entitled to a defense and indemnification--only if he is considered a "volunteer worker." Further conceding that Lambert was obligated to work at the Jail in some capacity, Appellees nevertheless contend that Lambert's choice to work in the kitchen counsels a finding that he qualifies as a "volunteer worker" under the Policy. We, however, are convinced that Appellees' argument obscures the broader portrait of institutional confinement, which is hallmarked by the Jail's coercive authority over inmates like Lambert. Attention to the realities of Lambert's status as an inmate--in particular, his duty to work--compels reversal. Because we hold that the ordinary definition of "volunteer worker" does not include Lambert, we reverse and remand to the district court with instructions to enter judgment in favor of National Union.

A.

Under West Virginia law,[1] courts must enforce the plain and unambiguous provisions of an insurance policy, refusing to become ensnared in the parties' intricate interpretative debates. Shamblin v. Nationwide Mut. Ins. Co., 332 S.E.2d 639, 642 (W. Va. 1985). Recognizing that a comprehensive insurance policy cannot possibly include a definition for every term used, courts applying West Virginia law must "accord the language of an insurance policy its common and customary meaning." Boggs v. Camden-Clark Mem'l Hosp. Corp., 693 S.E.2d 53, 57–58 (W. Va. 2010). In other words, " '[l]anguage in an insurance policy should be given its plain, ordinary meaning.' " Id. at 58 (quoting Horace Mann Ins. Co. v. Adkins, 599 S.E.2d 720, 724 (W. Va. 2004)).

Only where a term is ambiguous--" 'reasonably susceptible of two different meanings or . . . of such doubtful meaning that reasonable minds might be uncertain or disagree as to its

---

[1] The parties agree that West Virginia law governs interpretation of the Policy, with good reason. We apply the substantive law of the forum state, including the state's choice-of-law rules, when sitting in diversity. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). Under the law of West Virginia--the forum state here-- the law of the state in which the contract is executed and to be performed governs adjudication of claims arising out of that agreement. Howe v. Howe, 625 S.E.2d 716, 721 (W. Va. 2005). In this case, that state is West Virginia.

meaning' "--will a court construe the policy " 'strictly against the insurer and liberally in favor of the insured.' " Shamblin, 332 S.E.2d at 642 (quoting Surbaugh v. Stonewall Cas. Co., 283 S.E.2d 859, 860–61 (W. Va. 1981)). But West Virginia courts are not predisposed to adjudge a term ambiguous, and " 'agreements are not necessarily ambiguous [just] because the parties disagree as to the meaning of the language of the agreement.' " Tri-State Asphalt Prods., Inc. v. Dravo Corp., 412 S.E.2d 225, 230 (W. Va. 1991) (quoting Orteza v. Monongalia Cnty. Gen. Hosp., 318 S.E.2d 40, 43 (W. Va. 1984)). Moreover, even a provision facially amenable to alternative interpretations "should never be interpreted so as to create an absurd result." D'Annunzio v. Security-Conn. Life Ins. Co., 410 S.E.2d 275, 279 (W. Va. 1991) (quoting Soliva v. Shand, Morahan & Co., 345 S.E.2d 33, 35 (W. Va. 1986)). Instead, such language "should receive a reasonable interpretation, consistent with the intent of the parties." Id. at 41 n.1 (quoting Soliva, 345 S.E.2d at 35).

B.

Concluding, consistent with the parties and the district court, that the term "volunteer worker" is unambiguous, we next consider the appropriate contours of its meaning.

8

We first look to the "common and customary meaning," Boggs, 693 S.E.2d at 58, of "volunteer." Freedom from coercion and absence of legal obligation compose the bedrock of definitions of "volunteer." For instance, Black's Law Dictionary defines "volunteer" as "[a] voluntary actor," one who acts "[u]nconstrained by interference . . . [or] outside influence" and has no legal obligation. Black's Law Dictionary 1711 (9th ed. 2009). Webster's defines "volunteer" as "a person whose actions are not founded on any legal obligation so to act" and who acts "by free choice[,] . . . without compulsion or obligation." Webster's Unabridged Dictionary 2131 (2d ed. 2001). And in the federal statutory context, the Fair Labor Standards Act ("FLSA") considers as volunteers only those individuals whose "services are offered freely and without pressure or coercion, direct or implied." 29 C.F.R. § 553.101(c).

Although no court has squarely applied the commonsense definition of "volunteer" to the prison context, judicial appraisal of the status of inmates for FLSA purposes guides our inquiry. Courts have soundly rejected prisoners' claims that compulsion to work for less than the federal minimum wage contravenes the FLSA, holding that inmates are not "employees"

9

for purposes of the statutory scheme.[2]  The Seventh Circuit provided a cogent explication for refusing to extend the term "employee" to cover an incarcerated individual:

> Put simply, the [jail's] "control" over [the inmate] does not stem from any remunerative relationship or bargained-for exchange of labor for consideration, but from incarceration itself.  The control that the [jail] exercises over a prisoner is nearly total, and control over his work is merely incidental to that general control.  Indeed, the Thirteenth Amendment's specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment. . . . [T]here is too much control to classify the relationship as one of employment.

Vanskike v. Peters, 974 F.2d 806, 809–10 (7th Cir. 1992) (footnote omitted).

We looked to Vanskike with approval when we rejected an inmate's argument that he was covered by the FLSA's definition of "employee."  Harker v. State Use Indus., 990 F.2d 131, 133 (4th Cir. 1993).  We held "categorically" that the FLSA does not apply "to work done by inmates behind prison walls for any type of prison-operated industry or for the prison itself."  Id. at 135.  Characterizing the jail-inmate relationship as

---

[2] Appellees urge us not to rely on FLSA cases, because the cases do not involve insurance policies and are limited to disputes over the federal minimum wage.  This view is shortsighted.  Judicial evaluation of the argument that an inmate qualifies as an "employee" under the FLSA necessarily implicates questions of coercion and control, elements essential to disposition of this case.

10

"custodial," we reasoned that the jail "wields virtually absolute control over [inmates] to a degree simply not found in the free labor situation of true employment." Id. at 133. That inmates may voluntarily apply for particular positions was of no moment to our analysis, as inmates "certainly are not free to walk off the job site and look for other work." Id. We further found noteworthy that, "[w]hen a shift ends, inmates do not leave [jail] supervision, but rather proceed to the next part of their regimented day." Id. Our analysis harmonizes with that of other circuits to later consider the issue. See Burleson v. California, 83 F.3d 311, 314 (9th Cir. 1996); McMaster v. Minnesota, 30 F.3d 976, 980 (8th Cir. 1994).

C.

Viewing the plain meaning of "volunteer worker" through the prism of West Virginia's rules of insurance-policy construction, we find that Lambert assuredly does not qualify as a "volunteer worker" under the Policy.

As the foregoing makes clear, absence of coercion is the thread uniting the disparate definitions of "volunteer." To be considered a "volunteer worker," then, Lambert must have elected to work of his own volition. A close look at West Virginia statutes and the nature of Lambert's confinement reveals that his work in the kitchen was anything but voluntary. As an

11

initial matter, Lambert conceded that he was obligated to work at the Jail in some capacity. The Jail's policy is wholly consistent with West Virginia law, which requires inmates to participate in jail work assignments, W. Va. Code R. § 95-1-21.3.[3] Because Lambert was compelled to work at the Jail, he cannot be considered a "volunteer worker" under the Policy.[4]

The nature of incarceration and the jail-inmate relationship further underscores that Lambert is by no means a "volunteer worker." We have emphasized that, "[b]ecause . . . inmates are involuntarily incarcerated, the [jail] wields virtually absolute control over them to a degree simply not

---

[3] Appellees argue that a West Virginia regulation, W. Va. Code R. § 95-1-20.2, gives an inmate like Lambert the option of volunteering for work assignments. They mistakenly view this regulation out of context. In full, the regulation states, "Pre-trial and unsentenced detainees shall not be required to work except to do personal housekeeping. Any inmate may volunteer for work assignments or institutional programs." Id. By its very terms, the regulation gives the option of volunteering for work assignments only to pre-trial and unsentenced detainees, a class that does not include Lambert. Indeed, for inmates who have already been sentenced, West Virginia regulations impose a duty to work. Id. § 95-1-21.3.

[4] Appellees' reliance on In re Wissink, 81 P.3d 865 (Wash. Ct. App. 2003), misses the mark. The court in Wissink held that an inmate was properly classified as a volunteer where the jail did not require participation in work assignments, a factor critical to the court's conclusion that the inmate "made an active and reasoned decision to work. . . . [and] was not coerced or forced to work in contravention of his own will." Id. at 869. In stark contrast to the regime at issue in Wissink, the Jail required Lambert to work. Wissink is thus readily distinguishable.

found in the free labor situation of true employment." Harker, 990 F.2d at 133; accord Vanskike, 974 F.2d at 810 ("[T]here is too much control to classify the [jail-inmate] relationship as one of employment."). Because a volunteer generally enjoys more freedom than an employee and courts uniformly hold that a jail's absolute authority over an inmate precludes a finding that an inmate is an employee, we have little trouble concluding that an inmate is not a "volunteer worker." Indeed, Lambert's thwarted protest provides a case study in the coercive authority of jails. Whereas a volunteer worker under the ordinary meaning of the term would have been free to leave his shift at his discretion without suffering a concrete penalty, Lambert was put in "the hole" for five days when he refused to finish his kitchen shift. At bottom, the Jail's "virtually absolute control" over Lambert, Harker, 990 F.2d at 133, which renders Lambert's status as a worker something approximating involuntary servitude, Vanskike, 974 F.2d at 809, yields an impossible fit between his role and the definition of "volunteer worker."

That Lambert succeeded in his efforts to obtain a work assignment in the kitchen does not undermine his exclusion from Policy coverage. To be sure, Lambert submitted an application to work in the kitchen out of a desire "[t]o eat extra food and to get out of [his] cell." J.A. 118. But his ability to express an assignment preference does not convert the

13

overarching obligation to work from required to optional. See Burleson, 83 F.3d at 314 ("[P]laintiffs mistakenly equate the ability to choose between various work programs offered by the [jail], with the freedom to 'sell' their labor."). Had Lambert failed to submit an application or had the Jail denied his request to serve in the kitchen, he still would have been forced to work in some capacity. Nor does Lambert's choice to apply for a job in the kitchen alter the Jail's broader coercive authority and "virtually absolute control" over him, see Harker, 990 F.2d at 133, factors that we find make Lambert anything but a "volunteer worker."

## III.

The common and customary meaning of "volunteer worker" forecloses Lambert's classification as an "insured" under the Policy. Accordingly, we reverse the judgment of the district court and remand for entry of judgment in favor of National Union.

REVERSED AND REMANDED

14