# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Charles L. Anania,**
**Plaintiff Below, Petitioner**

**FILED**

May 30, 2014

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 13-0406** (Pocahontas County 06-C-53)

**Snowshoe Mountain, Inc., doing**
**business as Snowshoe Mountain Resort,**
**Defendant Below, Respondent**

## MEMORANDUM DECISION

Petitioner Charles L. Anania, by counsel Joshua I. Barrett and Robert M. Bastress III, appeals the order of the Circuit Court of Pocahontas County, entered March 25, 2013, granting summary judgment in favor of Respondent Snowshoe Mountain, Inc. Respondent appears by counsel John Philip Melick, Ellen S. Cappellanti, and Ryan J. Aaron.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner is the representative property owner in this class action challenging the method in which respondent, a resort area, calculates annual assessments for safety provisions and the upkeep of common areas in its domain.[1] The source of authority for the collection of the assessments is the "Declaration of Restrictions, Conditions, Easements, Liens and Charges" dated June 14, 1974 [hereinafter, "the declaration"], and later recorded in the Pocahontas County Clerk's Office, which provides in part:

---

[1]Assessments are collected from approximately 2,000 property owners. The total amount collected annually has ranged from $1.5 million to $3 million since 2001. As the circuit court explained, there are two "sections" of membership in this class action. Section A of the class is made up of people who were owners of realty at Snowshoe Mountain Resort as of September 21, 2010. Section B is comprised of people invited to opt into the class, who owned subject property between November 27, 1995, and September 21, 2010, but did not own as of September 21, 2010. Petitioner purchased property in the Westridge subdivision of Snowshoe Mountain in September of 2003, and later conveyed the property by unrecorded deed to a limited liability company, of which he has a one-third interest.

1

XIII
Assessment By Snowshoe and
Lien Therefore

A. Each owner or purchaser of a lot shown on the herein referred to map or plat shall by acceptance of a deed thereto or by the signing of a contract or an agreement to purchase the same, whether from Snowshoe or a subsequent owner or purchaser of such lot, covenant, agree and bind himself, his heirs, personal representatives, successors and assigns to pay an annual assessment, determined as hereinafter provided, for the maintenance and care of the roads, streets, alleys, sidewalks, parks, common areas and common facilities in and around Snowshoe to which lot owners have a right of use or access, and for fire and police protection, and for such other services as may be made available to lot owners or purchasers by Snowshoe.

B. Until such time as a lot owner or purchaser shall commence the construction of improvements upon his lot, the annual assessment as aforesaid shall be an amount equal to one-half (1/2) of one percent (1%) of the list purchase price of the lot at the time of purchase.

C. Effective on June 1 of the year following the year in which the construction of improvements commences upon a lot, the annual assessment as aforesaid shall be an amount not to exceed, in the absolute and sole discretion of Snowshoe, a sum equal to 1 ½ percent of the taxable (assessed) value of the lot.[2]

D. The statement or bill for the aforesaid applicable annual assessment for each year (or for a pro rata portion thereof for the year in which the purchase was made) shall be rendered by Snowshoe in July of each year and is payable at any time thereafter and shall be due by October of such year. Any permissible increase in the assessment contained herein shall be based upon the percentage increase in the said Consumer's Price Index, or any successor index thereto, during the twelve calendar months preceding the end of the month prior to the month in which Snowshoe renders the annual statement for assessments.[3]

The declaration was drafted by respondent's predecessor; respondent has owned Snowshoe Mountain Resort since 1995.[4] Petitioner filed his complaint in 2006, asserting, among

---

[2]Though Paragraph C permits respondent to exercise its "absolute and sole discretion" in this matter, the circuit court noted that, historically, respondent has established the amount of annual assessments in a budgeting process "accomplished in concert" with the Snowshoe Property Owners Council.

[3]This appears to be the first and only reference in the declaration to the consumer price index.

[4]Subsequent declarations have been recorded, though not all were included in the appendix record on appeal. The parties included a declaration recorded in 1977 for comparison

other grievances, that respondent breached the parties' contract by using an improper formula to calculate annual assessments.[5] The crux of petitioner's position was that the 1.5% provided in Paragraph C is intended to apply to the "base year" only, and Paragraph D calls for the application to the base amount of a multiplier not exceeding the consumer price index for the prior twelve-month period.[6] After a lengthy period of discovery, the parties each filed a motion for summary judgment, and the circuit court granted respondent's motion by order entered March 25, 2013. In doing so, the circuit court explained that Paragraphs C and D are "inherently inconsistent" and that Paragraph D is a boilerplate escalator clause mistakenly included by the drafter.[7] Based on this determination, the circuit court concluded that Paragraph C alone guided the calculation of the assessments for all years following the year in which construction commenced, and respondent had appropriately computed the obligations.

---

purposes, noting that Paragraph D was identical in the 1974 and 1977 versions; however, petitioner's deed references only the 1974 declaration.

[5]Petitioner also asserted fraud for respondent's "misrepresentation" that the assessments were correctly made, as well as breach of the duty of good faith and fair dealing. On appeal, petitioner challenges only the grant of summary judgment with regard to the breach of contract claim.

[6]We borrow this explanation of the Consumer Price Index, or "CPI":

> The CPI is a periodic statistical measure, undertaken by the United States Department of Labor, of the average change in prices in a fixed market basket of goods. The CPI, as a whole, entails approximately thirty separate indexes. Since its inception during World War I the index has undergone several revisions. The "general summary" or comprehensive index represents the broadest of all of the separate indexes in the CPI. Among the additional indexes are ones which cover particular geographic regions, metropolitan areas and population-size groups. However, the comprehensive index stands as the primary listing in the group of indexes known together as the CPI.

*Trautman v. Hill*, 116 Idaho 337, 340, 775 P.2d 651, 654 (Idaho App.1989) (citations omitted).

[7]The Department of Labor warns: "[W]hen an escalation contract is tied to the CPI, the index to be used should be spelled out clearly in the contract to avoid potential conflicts, as the Bureau of Labor Statistics cannot mediate disputes which might arise between the parties to an escalation agreement." http://stats.bls.gov/cpi/cpifaq.htm#Question_14. The Bureau of Labor Statistics offers a number of suggestions for parties using a consumer price index as an escalator, including: (1) clearly define the base payment that is subject to escalation; (2) identify the index series that will be used for escalation; and (3) specify a reference period from which changes in the index will be measured. http://stats.bls.gov/cpi/cpi1998d.htm. However, one court has written: "When used without qualification, [the CPI] is generally taken to mean the national average figures." *Satterfield v. Layton*, 669 S.W.2d 287, 288-89 (Mo. App. 1984).

Petitioner appeals the circuit court's grant of summary judgment in favor of the respondent. This Court reviews a circuit court's entry of summary judgment under a de novo standard of review. Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In conducting a de novo review, this Court applies the same standard for granting summary judgment that a circuit court must apply. *United Bank, Inc. v. Blosser*, 218 W.Va. 378, 383, 624 S.E.2d 815, 820 (2005). Further, "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). "'[T]he party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor.' *Anderson* [*v. Liberty Lobby, Inc.*], 477 U.S. [242] at 252, 106 S.Ct. [2505] at 2512, 91 L.E.2d [202] at 214 [1986]." *Williams*, 194 W.Va. at 60, 459 S.E.2d at 337. We also reiterate: "The interpretation of [a] . . . contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgment, shall be reviewed *de novo* on appeal." Syl. Pt. 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). It is a settled principle, long recognized in this state that "'[i]t is the province of the [c]ourt, and not of the jury, to interpret a written contract.' Syl. Pt. 1, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937)." Syl. Pt. 1, *Orteza v. Monongalia County General Hospital*, 173 W.Va. 461, 318 S.E.2d 40 (1984).

Petitioner puts forth four assignments of error on appeal, all concerning the circuit court's interpretation of the declaration. We begin our discussion with the following basic principles:

> In construing the terms of a contract, we are guided by the common-sense canons of contract interpretation. One such canon teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning. *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1985). Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken. In note 23 of *Williams* [*v. Precision Coil, Inc.*], 194 W.Va. [52,] at 65, 459 S.E.2d [329,] at 342 [(1995)], we said: "A contract is ambiguous when it is *reasonably* susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." (Emphasis added).

*Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 101, 468 S.E.2d 712, 716 (1996). In syllabus point one of *Berkeley County Public Service District v. Vitro Corp. of America*, 152 W.Va. 252, 162 S.E.2d 189 (1968), this Court cautioned that "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." *Accord Pilling v. Nationwide Mut. Fire Ins. Co.*, 201 W.Va. 757, 759, 500 S.E.2d 870, 872 (1997). Construction of the language is undertaken only when it is determined that an actual ambiguity exists. "Only if the court makes the determination that the contract cannot be given a

certain and definite legal meaning, and is therefore ambiguous, can a question of *fact* be submitted to the jury as to the meaning of the contract. It is only when the document has been found to be ambiguous that the determination of intent through extrinsic evidence becomes a question of fact." *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995).

First, petitioner argues that the circuit court "changed" contractual language by omitting Paragraph D from its reading of the applicable declaration. In that vein, he argues in his fourth assignment of error that the circuit court erred when it made the unsupported factual determination that the inclusion of Paragraph D in respondent's predecessor's draft of the declaration was the result of mistake. It is worth noting that petitioner purchased property in the resort area in 2003, and respondent purchased Snowshoe Mountain in 1995. Neither participated in the drafting of the declaration in 1974, and the parties concede that there is no evidence of the drafter's intent. However, Paragraph C unequivocally grants respondent "absolute and sole discretion" to annually calculate assessments up to 1.5% of the assessed taxable value of the lot.[8] We find no plain language restriction in that paragraph suggesting that a "base" is established in the year after construction is completed. Furthermore, petitioner's proposed construction is unreasonable. As the circuit court explained, petitioner's interpretation potentially commits respondent indefinitely to an assessment base before property value is realized, and leaves that base susceptible to manipulation by a property owner who may choose to delay improvements. Again, the language in the declaration contained in Paragraph C is clear, vesting "absolute and sole discretion" with respondent. We thus agree with the circuit court that the declaration is not ambiguous because the mistaken inclusion of the Paragraph D escalator clause is apparent on the face of the document.

We now consider petitioner's third assignment of error, in which he argues that the circuit court failed to apply rules of construction favoring him. As the circuit court aptly explained, the instrument must be construed against the grantor only if the language is ambiguous after consideration of the context and circumstances surrounding the contract formation. *McIntyre v. Zara*, 183 W.Va 202, 206, 394 S.E.2d 897, 901 (1990). Upon the circuit court's acknowledgement that Paragraph D was clearly included by mistake, the terms of the declarations had but one meaning. As we concluded in *Pilling*, "[a]lthough the contract at issue in the present case is poorly drafted, its meaning can still be discerned." *Pilling* at 759, 500 S.E.2d at 872.

For the foregoing reasons, we affirm.

Affirmed.

---

[8]For these reasons, we also reject the argument supporting petitioner's second assignment of error that the circuit court failed to enforce clear contractual language. The clear language of the declarations vests in respondent the "absolute and sole discretion" to calculate annual assessments up to 1.5% of the assessed taxable value of the property.

**ISSUED:** May 30, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Allen H. Loughry II

**DISSENTING:**

Justice Brent D. Benjamin

Justice Menis E. Ketchum

The circuit court attempted to clarify an ambiguous contract as if the contract were affected by a simple scrivener's error. In reality, we are faced with a substantive dispute that requires greater attention than such treatment allows. While I acknowledge the difficulty (attributable to a lack of historical evidence) facing a fact-finder in this case, I believe the result reached by the circuit court unfairly affords a presumption to the drafting party. I do not find it unreasonable that early purchasers may have wished to establish some degree of control over their assessments. The characterization of the attempt as a mistake is perplexing, particularly in view of a similar provision having been incorporated in the counterpart document for the sale of condominium properties only three years after drafting of the 1974 declaration. The terms are substantively confusing and capable of multiple interpretations, and therefore would be more appropriately untangled by a jury.

I dissent.